# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

---

In re:

Diocese of Duluth,

        Debtor-in-Possession.

Bankruptcy Case No.:  15-50792

Chapter 11

---

Diocese of Duluth,

        Plaintiff,

v.

LIBERTY MUTUAL GROUP, a Massachusetts
Corporation; CATHOLIC MUTUAL RELIEF
SOCIETY OF AMERICA, a Nebraska
corporation; FIREMAN'S FUND
INSURANCE COMPANY, a California
corporation; CHURCH MUTUAL
INSURANCE COMPANY, a Wisconsin
corporation and THE CONTINENTAL
INSURANCE COMPANY, an Illinois
corporation,

        Defendants.

Adversary Proceeding No.: 16-05012

---

## NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT
## ON THE NUMBER OF OCCURRENCES

---

TO:    THE DEFENDANTS AND OTHER ENTITIES SPECIFIED IN LOCAL RULE 9013-3.

      1.      The Diocese of Duluth through its undersigned attorneys, respectfully moves the

Court for the relief request below and gives notice of hearing.

      2.      The Court will hold a hearing on this motion on **January 26, 2017 at 10:30 a.m.**,

or as soon thereafter as counsel can be heard, before the Honorable Robert J. Kressel, in

Courtroom 8 West, 300 South Fourth Street, Minneapolis, MN 55415.

3.      Local Rule 9006-1(c) provides deadlines for responses to this motion.  **Any response to this motion must be filed and delivered not later than January 20, 2017**, which is five (5) days prior to the time set for the hearing including Saturdays, Sundays and holidays.

**UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

4.      The Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334, Fed. R. Bank. P. 5005, and Local Rule 1071-1.  This is a core proceeding.

5.      The petition commencing this chapter 11 case was filed on December 7, 2015. This case is currently pending before this Court.  The complaint commencing this adversary proceeding was filed on June 24, 2016.

6.      The motion arises under Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056.  This motion is filed under Federal Rule of Bankruptcy Procedure 9014 and Local Rules 7007-1, 9013-1, 9013-2, 9006-1 and 9017-1.

WHEREFORE, the Diocese of Duluth respectfully moves the Court for an Order granting partial summary judgment in favor of the Diocese of Duluth and holding that the legal standard for determining the number of occurrences corresponds to the number of times a victim was abused limited to one such occurrence per-victim, per-priest, per-policy year.

Dated:   New York, New York                          Respectfully submitted,
              December 19, 2016

                                                                    **BLANK ROME LLP**

                                              By:   /s/ *James R. Murray*
                                                      James R. Murray (admitted *pro hac vice*)
                                                      1825 Eye Street NW
                                                      Washington, DC 20006
                                                      Telephone: (202) 420-3409
                                                      Facsimile: (202) 420-2201
                                                      jmurray@blankrome.com

Jared Zola (admitted *pro hac vice*)
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: (212) 885-5209
Facsimile: (917) 591-8538
jzola@blankrome.com

-and-

**GRAY PLANT MOOTY**
 **MOOTY & BENNETT, P.A.**

By:   /s/ *Phillip L. Kunkel*
Phillip L. Kunkel (#058981)
Nicholas N. Nierengarten (#079169)
1010 West Germain Street, Suite 500
Saint Cloud, MN 56301
Telephone: (320) 202-5335
Facsimile: (320) 252-4482
Phillip.kunkel@gpmlaw.com
Nicholas.nierengarten@gpmlaw.com

*Counsel for the Diocese of Duluth*

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

---

In re:                                          Bankruptcy Case No.:  15-50792

Diocese of Duluth,                              Chapter 11

        Debtor-in-Possession.

---

Diocese of Duluth,

        Plaintiff,

                              Adversary Proceeding No.: 16-05012

v.

    LIBERTY MUTUAL GROUP, a Massachusetts
corporation; CATHOLIC MUTUAL RELIEF SOCIETY
OF AMERICA, a Nebraska corporation; FIREMAN'S FUND
INSURANCE COMPANY, a California corporation;
CHURCH MUTUAL INSURANCE COMPANY,
a Wisconsin corporation and THE CONTINENTAL
INSURANCE COMPANY, an Illinois corporation,

        Defendants.

---

### DECLARATION OF JAMES R. MURRAY IN SUPPORT OF
### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR
### PARTIAL SUMMARY JUDGMENT ON NUMBER OF OCCURRENCES

---

James R. Murray, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that

the following is true and correct:

1.        I am a partner with Blank Rome LLP, counsel for plaintiff Diocese of Duluth

("Diocese") in this adversary proceeding.  I am familiar with the facts and circumstances of this

action by virtue of my involvement in this matter and review of the case files and believe that the

information provided herein is true and correct to the best of my knowledge.  I submit this

declaration in support of the Diocese's Motion for Partial Summary Judgment on the Number of

Occurrences.

    2.    Attached hereto as **Exhibit A** is a true and correct copy as produced by the

Diocese to the insurance company defendants in this adversary proceeding of certain

Agricultural Insurance Company ("Liberty Mutual") insurance policy forms for the 1964 to 1967

policy period bearing numbers DD_INS_00172-00174 and DD_INS_00178-00179.

    3.    Attached hereto as **Exhibit B** is a true and correct copy as produced by the

Diocese to the insurance company defendants in this adversary proceeding of certain Fireman's

Fund Insurance Company of Newark, NJ ("CNA") insurance policy forms for the 1973 to 1976

policy period bearing numbers DD_INS_00195-196 and DD_INS_00236-00242.

Dated:  December 16, 2016

By:   *James R. Murray*
        James R. Murray (admitted *pro hac vice*)

2

# EXHIBIT A



**FORM J-26555A 2-63 CLA SERIES**

# AGRICULTURAL INSURANCE COMPANY
### (A STOCK INSURANCE COMPANY, HEREIN CALLED THE COMPANY)

Agrees with the insured, named in the declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the declarations and subject to the limits of liability, exclusions, conditions and other terms of this policy:

## INSURING AGREEMENTS

**I. COVERAGE A. PERSONAL INJURY LIABILITY—AUTOMOBILE.** To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury, including death at any time resulting therefrom, sustained by any person, caused by an occurrence as defined herein and arising out of the ownership, maintenance or use of any automobile.

**COVERAGE B. PERSONAL INJURY LIABILITY—EXCEPT AUTOMOBILE.** To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury, including death at any time resulting therefrom sustained by any person and caused by an occurrence as defined herein.

**COVERAGE C. PROPERTY DAMAGE LIABILITY—AUTOMOBILE.** To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by an occurrence as defined herein, and arising out of the ownership, maintenance or use of any automobile.

**COVERAGE D. PROPERTY DAMAGE LIABILITY—EXCEPT AUTOMOBILE.** To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of tangible property, including the loss of use thereof, ...

**II. DEFENSE, SETTLEMENT, SUPPLEMENTARY PAYMENTS.** With respect to such insurance as is afforded by this policy, the company shall:

(a) defend any suit against the insured alleging such personal injury, death or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;

(b) (1) pay all premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy, all premiums on appeal bonds required in any such defended suit, the cost of bail bonds required of the insured in the event of automobile accident or automobile traffic law violation during the policy period, not to exceed $100 per bail bond, but without any obligation to apply for or furnish any such bonds;

(2) pay all expenses incurred by the company, all costs taxed against the insured in any such suit and all interest accruing after entry of judgment until the company has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of the company's liability thereon;

(3) pay expenses incurred by the insured for such immediate medical and surgical relief to others as shall be imperative at the time of the occurrence;

DD_INS_00172

# COMPREHENSIVE LIABILITY POLICY
## (GENERAL - AUTOMOBILE)

... and not
to increase

...y is certified
motor vehicle
orded by this
with the pro-
arising out of
red hereunder,
' no event in
...the con-

upon the basis of which premium credit is given.

**15. SUBROGATION.** In the event of any payment under this policy, the company sh... rogated to all the insured's rights of recovery therefor against any person or organi... the insured shall execute and deliver instruments and papers and do whatever else is... to secure such rights. The insured shall do nothing after loss to prejudice such right...

**16. THREE  YEAR POLICY.** A policy period of three years is comprised of three c... annual periods. Rates for hazards are subject to amendment for the second and t... periods in accordance with the company's rules and rating plans. Amended rat... stated by endorsement issued to form a part of the policy. Computation an...

(4) reimburse the insured for all reasonable expenses, other than loss of earnings, incurred at the company's request;

and the amounts so incurred, except settlements of claims and suits, are payable by the company in addition to the applicable limit of liability of this policy.

**III. DEFINITION OF INSURED.** The unqualified word "insured" includes the named insured and also includes (1) under Coverages B and D, any executive officer, director or stockholder thereof while acting within the scope of his duties as such, and any organization or proprietor with respect to real estate management for the named insured, and if the named insured is a partnership, the unqualified word "insured" also includes any partner therein but only with respect to his liability as such, and (2) under coverages A and C, any person while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission, any executive officer of the named insured with respect to the use of a non-owned automobile in the business of the named insured.

**IV. USE OF OTHER AUTOMOBILES--SPOUSE.** If the named insured is described in Item 1 of the declarations as an individual and if the named insured and spouse are residents of the same

household, such insurance as is afforded by this policy under Coverages A and C applies, with respect to non-owned automobiles, to the spouse of such named insured as insured and to any other person or organization legally responsible for the use by such spouse of an automobile not owned or hired by such other person or organization.

This insuring agreement does not apply:

(a) with respect to any automobile owned by such spouse or a member of the household of such spouse other than a private chauffeur or domestic servant of such spouse;

(b) with respect to any automobile while used in the business or occupation of such spouse except an automobile operated or occupied by such spouse, chauffeur, or domestic servant;

(c) with respect to any occurrence arising out of the operation of an automobile repair shop, public garage, sales agency, service station or public parking place.

**V. POLICY PERIOD, TERRITORY.** This policy applies only to occurrences which take place during the policy period within North America or any possession of the United States wherever located, and with respect to automobiles, also while the automobile is on a vessel between ports within said territory.

# EXCLUSIONS

THIS POLICY DOES NOT APPLY:

(a) to liability assumed by the insured under any contract or agreement except under Coverages B and D, (1) a contract as defined herein or (2) as respects the insurance which is afforded for the Products Hazard as defined, a warranty of goods or products;

(b) to personal injury, death or destruction due to war, whether or not declared, civil war, insurrection, rebellion or revolution, or to any act or condition incident to any of the foregoing, with respect to (1) liability assumed by the insured under any contract or agreement or (2) expenses under Insuring Agreement II (b) (3);

(c) under Coverages B and D, to any obligation for which the insured may be held liable in an action on a contract or an agreement by a person not a party thereto;

(d) under Coverages B and D, except with respect to operations performed by independent contractors and except with respect to liability assumed by the insured under a contract as defined herein, to the ownership, maintenance, operation, use, loading or unloading of (1) watercraft if the accident occurs away from premises owned by, rented to or controlled by the named insured, except insofar as this part of this exclusion is stated in the declarations to be inapplicable, (2) automobiles if the occurrence happens away from such premises or the ways immediately adjoining, or (3) aircraft;

(e) to liability imposed upon the insured or any indemnitee, as a person or organization engaged in the business of manufacturing, selling or distributing alcoholic beverages, or as an owner or lessee of premises used for such purposes, arising out of the sale, gift, or distribution of any alcoholic beverage;

(f) under Coverages A and B, to any obligation for which the insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(g) under Coverages A and D, except with respect to liability assumed by the insured under a contract as defined herein, to personal injury or death of any employee of the insured arising out of and in the course of his employment by the insured, other than a domestic employee whose injury arises out of an automobile covered by this policy and for whose injury benefits in whole or in part are not payable or required to be provided under any workmen's compensation law;

(h) under Coverage C, to injury to or destruction of property owned or transported by the insured, or property rented to or in charge of the insured other than a residence or private garage injured or destroyed by a private passenger automobile covered by this policy;

i) under Coverage D, to injury to or destruction of (1) property owned or occupied by or rented to the insured, or (2) except with respect to liability under sidetrack agreements covered by this policy, property used by the insured, or (3) except with respect to liability under such sidetrack agreements or the use of elevators or escalators at premises owned by, rented to or controlled by the named insured, property in the care, custody or control of the insured or property

as to which the insured for any purpose is exercising physical control, or (4) any goods, products or containers thereof manufactured, sold, handled or distributed or premises alienated by the named insured, or work completed by or for the named insured, out of which the occurrence arises;

(j) under Coverage D, to injury to or destruction of buildings or property therein, wherever occurring, arising out of any of the following causes, if such cause occurs on or from premises owned by or rented to the named insured: (1) the discharge, leakage or overflow of water or steam from plumbing, heating, refrigerating or air-conditioning systems, standpipes for fire hose, or industrial or domestic appliances, or any substance from automatic sprinkler systems, (2) the collapse or fall of tanks or the component parts or supports thereof which form a part of automatic sprinkler systems, or (3) rain or snow admitted directly to the building interior through defective roofs, leaders or spouting, or open or defective doors, windows, skylights, transoms or ventilators; but this exclusion does not apply to loss due to fire, to the use of elevators or escalators or to operations performed by independent contractors;

(k) under Coverages A, B, C and D, to personal injury, or death or damage to property caused intentionally by or at the direction of the insured;

(l) under division (2) of INSURING AGREEMENT III,

(1) with respect to an automobile while used with any trailer owned or hired by the insured and not covered by like insurance in the company; or with respect to a trailer while used with any automobile or hired by the insured and not covered by like insurance in the company;

(2) to any person or organization, or to any agent or employee thereof, operating an automobile sales agency, repair shop, service station, storage garage or public parking place with respect to any occurrence arising out of the operation thereof, but this provision does not apply to a resident of the same household as the named insured, to a partnership in which such resident or the named insured is a partner, or to any partner, agent or employee of such resident or partnership;

(3) to any employee with respect to personal injury to or death of another employee of the same employer injured in the course of such employment in an occurrence arising out of the maintenance or use of an automobile in the business of such employer;

(4) with respect to any hired automobile, to the owner, or a lessee thereof other than the named insured, or to any agent or employee of such owner or lessee;

(5) with respect to any non-owned automobile, to any executive officer, if such automobile is owned by him or a member of the same household;

(m) under Coverage D, to damage caused by smoke, soot, fumes, and gases emitted from chimneys, stacks, or exhaust piping; pollution of waters, or damage to sewers, waste pipes, or drains, unless there be coincident with such damage a sudden, fortuitous, unexpected event identifiable in time and place.

DD_INS_00173

Eastern Division, Watertown, New York

Western Division, St. Paul 14, Minnesota

# No. CLA 770553

| | Prepaid | Audit Basis |
|---|---|---|
| | ☒ | ANNUAL |
| Auto. Instal. | Bill Ann. Prem. on | |
| ☐ | | |

Renewal of:       NEW

## DECLARATIONS

AGRICULTURAL  INSURANCE  COMPANY
NAME OF COMPANY

Item 1. Named
Insured:       DIOCESE  OF  DULUTH  AND

CHURCHES  NAMED  ON  CERTIFICATES

Address:
No. Street         Town         County         State

Item 2. Policy Period:

From  FEBRUARY 1, 1964  To  FEBRUARY 1, 1967
12:01 A.M. Standard time at the address of the named insured as stated herein:

Agricultural
Insurance Group

COMPREHENSIVE LIABILITY POLICY
(GENERAL - AUTOMOBILE)

Locations of all premises owned, rented
or controlled by named insured

Interest of named insured
in such premises

ENTER "SAME" IF SAME LOCATION AS ABOVE ADDRESS
Part occupied by
named insured

The named insured is       ENTER "OWNER," "GENERAL LESSEE" OR "TENANT"
                           CORPORATION
                           INDIVIDUAL, CORPORATION OR PARTNERSHIP

Business of the named insured is       SEE CERTIFICATES

Item 3.   The insurance afforded is only with respect to such and so many of the following coverages as are indicated by specific premium charge
or charges. The limit of the company's liability against each such coverage shall be as stated herein, subject to all the terms of this policy having
reference thereto.

| | COVERAGES | LIMITS OF LIABILITY | | ADVANCE PREMIUMS |
|---|---|---|---|---|
| A | Personal Injury Liability—Automobile | $ 50,000. | each person | $       SEE CERTIFICATES |
| | | $100,000. | each occurrence | |
| B | Personal Injury Liability— Except Automobile | $ 50,000. | each person | $       SEE CERTIFICATES |
| | | $100,000. | each occurrence | |
| | | $NOT COVERED | aggregate products | |
| C | Property Damage Liability—Automobile | $ 5,000. | each occurrence | $       SEE CERTIFICATES |
| D | Property Damage Liability— Except Automobile | $ 5,000. | each occurrence | |
| | | $ 25,000. | aggregate operations | |
| | | $ 25,000. | aggregate protective | |
| | | $NOT COVERED | aggregate products | |
| | | $ 25,000. | aggregate contractual | $       SEE CERTIFICATES |

Endorsements forming a part       26619, 26525, L6354A, 24369, 26603, 32637B
of the policy upon issuance: (Identify by Form Number)                                     $

                                                  Total Advance Premium | $       SEE CERTIFICATES

Item 4.   The declarations are completed on attached schedules.

Item 5.   Unless otherwise stated herein, the schedules (a) disclose all hazards insured hereunder known to exist at the effective date of this policy;
(b) contain a complete list of all automobiles and trailers owned by the named insured at the effective date of this policy and the purposes
of use thereof; (c) contain a complete list of all persons within the definition of Class I persons, at the effective date of this policy.

Exception, if any, to (a), (b) or (c):*

Item 6.   During the past three years no insurer has canceled insurance, issued to the named insured, similar to that afforded hereunder, unless other-

wise stated herein:*

Counter-
signed at   DULUTH, MINNESOTA                 on       JANUARY 17, 1964       by
                                                                          Authorized Representative

THESE DECLARATIONS TOGETHER WITH FORM J.   26555A, DATED       2-63       CLA SERIES, CONSTITUTE THE ABOVE NUMBERED POLICY.
Form D-26553   1-61   CLA Series                                          *Absence of an entry means "No Exceptions."

DD_INS_00174

Attach Declarations page along with any endorsements. This policy not complete unless such declarations page is attached.
(Note: Attach Declarations page so that top edge is flush with top edge of this jacket and left edge is flush with fold)

## CONDITIONS

. PREMIUM. Premium bases and rates for hazards to which the policy applies are those applicable in accordance with the company's rules, rates, rating plans, premiums and minimum premiums applicable to this insurance.

The premium stated in the declarations is a provisional premium only. Upon termination of this policy or at the end of each annual period, the earned premium shall be computed in accordance with the company's rules, rates, rating plans, premiums and minimum premiums applicable to this insurance. If the earned premium thus computed exceeds the estimated advance premium paid, the insured shall immediately pay the excess to the company; if less, the company shall return the unearned portion to the insured.

The named insured shall maintain for each hazard records of the information necessary for premium computation.

. AUDIT. The company shall be permitted to examine and audit the insured's books and records at any time during the policy period and any extension thereof and within three years after the final termination of this policy, as far as they relate to the premium bases or the subject matter of this insurance.

. DEFINITIONS.

a) CONTRACT. The word "contract" means a warranty of goods or products, or, if in writing, any contract or agreement of the named insured. Except where stated to the contrary, all exclusions of the policy apply to contractual liability coverage.

' AUTOMOBILE. Except where stated to the contrary, the word "automobile" means a land motor vehicle or trailer as follows:

(1) OWNED AUTOMOBILE. An automobile owned by the named insured;

(2) HIRED AUTOMOBILE. An automobile used under contract in behalf of, or loaned to, the named insured provided such automobile is not owned by or registered in the name of (a) the named insured or (b) an executive officer thereof or (c) an employee or agent of the named insured who is granted an operating allowance of any sort for the use of such automobile;

(3) NON-OWNED AUTOMOBILE. Any other automobile.

The following described equipment shall be deemed an automobile while towed by or carried on an automobile not so described, but not otherwise: if of the crawler-type, any tractor, power crane or shovel, ditch or trench digger; any farm-type tractor; any concrete mixer other than of a mix-in transit type, any grader, scraper, roller or farm implement; and, if not subject to motor vehicle registration, any other equipment not specified below, which is designed for use principally off public roads.

The following described equipment shall be deemed an automobile while towed by or carried on an automobile as above defined solely for purposes of transportation or while being operated solely for locomotion, but not otherwise: if of the non-crawler type, any power crane or shovel, ditch or trench digger; and any air-compressing, building or vacuum cleaning, spraying or welding equipment or well drilling machinery.

 SEMITRAILER. The word "trailer" includes semitrailer.

) PRIVATE PASSENGER AUTOMOBILE. The term "private passenger automobile" means a private passenger, station wagon or jeep type automobile, and also includes any automobile the purposes of use of which are stated in the declarations as "pleasure and business".

) TWO OR MORE AUTOMOBILES. The terms of this policy apply separately to each automobile insured hereunder, but a motor vehicle and a trailer or trailers attached thereto shall be held to be one automobile as respects limits of liability.

PURPOSES OF USE. The term "pleasure and business" is defined as personal, pleasure, family and business use. The term "commercial" is defined as use principally in the business occupation of the named insured as stated in the declarations, including occasional use for personal, pleasure, family and other business purposes. Use of an automobile includes the loading and unloading thereof.

JDUCTS-COMPLETED OPERATIONS HAZARD. The term "products hazard" means

(1) Goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, if the occurrence happens after possession of such goods or products has been relinquished to others by the named insured or by others trading under his name and if such occurrence happens away from premises owned, rented or con-

trolled by the named insured; provided such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented to or located for use of others but not sold;

(2) Operations, if the occurrence happens after such operations have been completed or abandoned and happens away from premises owned, rented or controlled by the named insured; provided-operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided further, the following shall not be deemed to be "operations" within the meaning of this paragraph: (i) pick-up or delivery, except from or onto a railroad car, (ii) the maintenance of vehicles owned or used by or in behalf of the insured, (iii) the existence of tools, uninstalled equipment and abandoned or unused materials.

(h) PERSONAL INJURY. The words "personal injury" mean bodily injury, sickness, disease, or if arising out of the foregoing, mental anguish and mental injury;

(i) OCCURRENCE. The word "occurrence" as used in this policy shall mean either an accident or a continuous or repeated exposure to conditions which result during the policy period in personal injury, including death at any time resulting therefrom, or injury to or destruction of tangible property, including the loss of use thereof, which is accidentally caused. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

4. LIMITS OF LIABILITY. COVERAGES A and B. The limit of personal injury liability stated in the declarations as applicable to "each person" is the limit of the company's liability for all damages, including damages for care and loss of services, arising out of personal injury, including death at any time resulting therefrom, sustained by one person in any one occurrence; the limit of such liability stated in the declarations as applicable to "each occurrence" is, subject to the above provision respecting each person, the total limit of the company's liability for all damages, including damages for care and loss of services, arising out of personal injury, sickness or disease, including death at any time resulting therefrom, sustained by two or more persons as the result of any one occurrence.

5. LIMITS OF LIABILITY. COVERAGES C and D. The limit of property damage liability stated in the declarations as applicable to "each occurrence" is the total limit of the company's liability for all damages arising out of injury to or destruction of all property of one or more persons or organizations, including the loss of use thereof, as the result of any one occurrence.

6. LIMITS OF LIABILITY. PRODUCTS. COVERAGES B and D. Subject to the limit of liability with respect to "each occurrence", the limits of personal injury liability and property damage liability stated in the declarations as "aggregate products" are respectively the total limits of the company's liability for all damages arising out of the products hazard. All such damages arising out of one lot of goods or products prepared or acquired by the named insured or by another trading under his name shall be considered as arising out of one occurrence.

7. LIMITS OF LIABILITY. COVERAGE D. Subject to the limit of liability with respect to "each occurrence", the limit of property damage liability stated in the declarations as "aggregate operations" is the total limit of the company's liability for all damages arising out of injury to or destruction of tangible property, including the loss of use thereof, caused by the ownership, maintenance or use of premises or operations rated upon a remuneration premium basis or by contractors' equipment rated on a receipts premium basis.

Subject to the limit of liability with respect to "each occurrence", the limit of property damage liability stated in the declarations as "aggregate protective" is the total limit of the company's liability for all damages arising out of injury to or destruction of tangible property, including the loss of use thereof, caused by operations performed for the named insured by independent contractors or omissions or supervisory acts of the insured in connection therewith, except maintenance or ordinary alterations and repairs on premises owned or rented by the named insured.

Subject to the limit of liability with respect to "each occurrence", the limit of property damage liability stated in the declarations as "aggregate contractual" is the total limit of the company's liability for all damages arising out of injury to or destruction of tangible property, including the loss of use thereof, with respect to each contract.

The limits of property damage liability stated in the declarations as "aggregate operations", "aggregate protective" and "aggregate contractual" apply separately to each project with

respect to operations being performed away from premises owned by or rented to the named insured.

**8. SEVERABILITY OF INTERESTS.** The term "the insured" is used severally and not collectively, but the inclusion herein of more than one insured shall not operate to increase the limits of the company's liability.

**9. FINANCIAL RESPONSIBILITY LAWS.** COVERAGES A and C. When this policy is certified as proof of financial responsibility for the future under the provisions of the motor vehicle financial responsibility law of any state or province, such insurance as is afforded by this policy for bodily injury liability or for property damage liability shall comply with the provisions of such law which shall be applicable with respect to any such liability arising out of the ownership, maintenance or use during this policy period of any automobile insured hereunder, to the extent of the coverage and limits of liability required by such law, but in no event in excess of the limits of liability stated in this policy. The insured agrees to reimburse the company for any payment made by the company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

**10. NOTICE TO THE COMPANY.** In the event of personal injury, death, injury to or destruction of property, written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstances of such injury, the names and addresses of the injured and of available witnesses.

**11. NOTICE OF CLAIM OR SUIT.** If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

**12. ASSISTANCE AND COOPERATION OF THE INSURED.** The insured shall cooperate with the company and, upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of injury.

**13. ACTION AGAINST COMPANY.** No action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. Nothing contained in this policy shall give any person or organization any right to join the company as a codefendant in any action against the insured to determine the insured's liability.

Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the company of any of its obligations hereunder.

**14. OTHER INSURANCE.** If the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss; provided, however, the insurance under this policy with respect to any hired automobile or any non-owned automobile shall be excess insurance over any other valid and collectible insurance available to the insured, either as an insured under a policy applicable with respect to such automobile or otherwise.

All insurance under this policy shall be excess insurance with respect to loss against which the named insured has other insurance disclosed to the company as in effect on the effective

date of this policy and upon the basis of which premium credit for other insurance is given but shall apply only in the amount by which the applicable limit of liability stated in the declarations exceeds the total applicable limits of liability of all valid and collectible insurance upon the basis of which premium credit is given.

**15. SUBROGATION.** In the event of any payment under this policy, the company shall be subrogated to all the insured's rights of recovery therefor against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights.

**16. THREE YEAR POLICY.** A policy period of three years is comprised of three consecutive annual periods. Rates for hazards are subject to amendment for the second and third annual periods in accordance with the company's rules and rating plans. Amended rates shall be stated by endorsement issued to form a part of the policy. Computation and adjustment of earned premium shall be made at the end of each annual period. Aggregate limits of liability as stated in this policy shall apply separately to each annual period.

**17. CHANGES.** Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

**18. ASSIGNMENT.** Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon; if, however, the named insured shall die, this policy shall cover (1) the named insured's legal representative as the named insured, and (2) under Coverages and C, subject otherwise to the provisions of Insuring Agreement III, any person having proper temporary custody of any owned automobile or hired automobile, as an insured, until the appointment and qualification of such legal representative; provided- that notice of cancelation addressed to the insured named in the declarations and mailed to the address shown in this policy shall be sufficient notice to effect cancelation of this policy.

**19. CANCELATION.** This policy may be canceled by the named insured by surrender thereof to the company or any of its authorized agents or by mailing to the company written notice stating when thereafter the cancelation shall be effective. This policy may be canceled by the company by mailing to the named insured at the address shown in this policy written notice stating when not less than ten days thereafter such cancelation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of the surrender or the effective date and hour of cancelation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the named insured or by the company shall be equivalent to mailing.

If the named insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancelation is effective or as soon as practicable after cancelation becomes effective, but payment or tender of unearned premium is not a condition of cancelation.

**20. JOINT INSURED.** If more than one insured is covered under this policy, the first named insured shall act for itself and for each and all of the insureds for all purposes of this policy. If the first named insured ceases for any reason to be covered under this policy, then the last named next named insured shall thereafter be considered as the first named insured for all the purposes of this policy.

**21. DECLARATIONS.** By acceptance of this policy the named insured agrees that the statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance.

IN WITNESS WHEREOF, the AGRICULTURAL INSURANCE COMPANY OF WATERTOWN, NEW YORK has executed and attested these presents, but this Policy shall not be valid unless countersigned by a duly authorized representative of the Company.

SECRETARY

PRESIDENT

# EXHIBIT B

# FIREMEN'S INSURANCE COMPANY
## OF NEWARK, N. J.
*A Stock Company Organized 1855*

### 860 WEST JACKSON BOULEVARD, CHICAGO, ILLINOIS 60606

## COMPREHENSIVE BUSINESS POLICY

### No. CBP 432832

Amount: (As stated in Schedules.)

Policy Term: Three Years

Inception: __April 24th, 1973__

Expiration: __April 24th, 1976__

| Surtax | |
|---|---|
| $23.00 | - |

Provisional Premium

$ _____ .If paid in advance.

$ __2,240.00__ each Installment, if
paid in Installments.

#### INSURED'S NAME AND MAILING ADDRESS

Diocese of Duluth
215 West 4th Street
Duluth, Minnesota

IN CONSIDERATION OF THE PROVISIONS AND STIPULATIONS HEREIN OR ADDED HERETO AND OF the premium above specified, this Company for a term of years specified above from inception date shown above (At Noon Standard Time) to expiration date shown above (At Noon Standard Time) at location of property involved, to an amount not exceeding the amount(s) above specified, does insure the insured named above and legal representatives.

The insurance effected above is granted against all LOSS OR DAMAGE BY FIRE ORIGINATING FROM ANY CAUSE, EXCEPT AS HEREINAFTER PROVIDED, ALSO ANY DAMAGE BY LIGHTNING AND BY REMOVAL FROM PREMISES ENDANGERED BY THE PERILS INSURED AGAINST IN THIS POLICY, to the property described hereinafter while located or contained as described in this policy, or pro rata for five days at each proper place to which any of the property shall necessarily be removed for preservation from the perils insured against in this policy, but not elsewhere. The amount of said loss or damage, except in case of total loss on buildings, to be estimated according to the actual value of the insured property at the time when such loss or damage happens.

If the insured property shall be exposed to loss or damage from the perils insured against, the insured shall make all reasonable exertions to save and protect same.

Assignment of this policy shall not be valid except with the written consent of this Company.

This policy is made and accepted subject to the foregoing provisions and stipulations and those hereinafter stated, which are hereby made a part of this policy, together with such other provisions, stipulations and agreements as may be added hereto, as provided in this policy.

Insurance is afforded only under those parts of the policy designated by the word "Included" opposite such part below. The insurance afforded under any part is only in the amounts and to the extent set forth in such part, subject to all the terms of the policy having reference thereto.

| | | |
|---|---|---|
| Part I | Fire, Lightning, Windstorm and Hail, Explosion, Riot, Riot attending a Strike, Civil Commotion, Aircraft and Vehicles, Sonic Shock Waves, Smoke, Vandalism and Malicious Mischief, Sprinkler Leakage, Elevator Collision, Accident to an Object (Steam Boiler, Fired Pressure Vessel or Electric Steam Generator) | INCLUDED |
| Part I (Optional) | Unfired Vessels and Machinery | Excluded |
| Part II | Business Income | Excluded |
| Part III | Inland Marine | Excluded |
| Part IV | Automobile Physical Damage | Excluded |
| Part V | Comprehensive Automobile Liability | Included |
| Part VI | Comprehensive General Liability | Included |
| Part VII | Crime | Excluded |

Countersignature Date  April 24th, 1973     Agency at      Duluth, Minnesota

_____ Agent

CBP 1—MINN.

Page 1

DD_INS_00195

Endorsement No. CBP 600G

Policy No. CBP  432832

## PART VI — COMPREHENSIVE GENERAL LIABILITY INSURANCE
### DECLARATIONS

The insurance afforded is only with respect to such of the following coverages as are indicated by a limit of liability. The limit of the company's liability against each such coverage shall be as stated herein, subject to all the terms of this policy having reference thereto.

### COVERAGES AND LIMITS OF LIABILITY

| Coverage A Bodily Injury Liability | | Coverage B Property Damage Liability | |
|---|---|---|---|
| each occurrence | aggregate | each occurrence | aggregate |
| $  300,000.00 | $ Not Covered | $  25,000.00 | $  25,000.00 |

### GENERAL LIABILITY HAZARDS

| Description of Hazards | Code No. | Premium Bases |
|---|---|---|
| (a) Premises—Operations | | (a) Area (Sq. Ft.) (b) Remuneration (c) |
| See Schedule Amended Attached | | |
| (b) Escalators | | Number Insured |
| Covered, If Any | | |
| (c) Independent Contractors | | Cost |
| Covered, If Any | | |
| (d) Completed Operations | | Receipts |
| Not Covered | | |
| (e) Products | | Sales |
| Not Covered | | |

Audit Period: Annual, unless otherwise stated.

The named Insured is: individual ☐; partnership ☐; corporation ☐; joint venture ☐; other (specify)— Church

Location of all premises owned by, rented to or controlled by the named insured. (Enter "same" if same location as address shown on page 1 of the policy.) See Schedule Amended Attached

Interest of named insured in such premises. (Describe interest, such as "owner", "general lessee" or "tenant".) Owner & Tenant

Part occupied by named insured Entire

The foregoing discloses all hazards insured hereunder known to exist at the effective date of this policy, unless otherwise stated herein.

Forms and Endorsements made a part of Part VI at time of issue: CBP 6005G    603D, 651D

GL-1

For typing text page off at perforations.

CBP 5000 — Dec—Incomplete without pages GL-2 through GL-10.

DD_INS_00196

## COMPREHENSIVE GENERAL LIABILITY INSURANCE

The Company, in consideration of the payment of the premium, in reliance upon the statements in the declarations of this endorsement made a part hereof and subject to all of the terms of this endorsement, agrees with the **named insured** as follows:

### I. COVERAGE A—BODILY INJURY LIABILITY
### COVERAGE B—PROPERTY DAMAGE LIABILITY

The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of

A. **bodily injury** or

B. **property damage**

to which this insurance applies, caused by an **occurrence,** and the company shall have the right and duty to defend any suit against the **insured** seeking damages on account of such **bodily injury** or **property damage,** even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

### Exclusions

This insurance does not apply:

(a) to liability assumed by the **insured** under any contract or agreement except an **incidental contract;** but this exclusion does not apply to a warranty of fitness or quality of the **named insured's products** or a warranty that work performed by or on behalf of the **named insured** will be done in a workmanlike manner;

(b) to **bodily injury** or **property damage** arising out of the ownership, maintenance, operation, use, loading or unloading of

    (1) any **automobile** or aircraft owned or operated by or rented or loaned to any **insured,** or

    (2) any other **automobile** or aircraft operated by any person in the course of his employment by any **insured;**

but this exclusion does not apply to the parking of an **automobile** on premises owned by, rented to or controlled by the **named insured** or the ways immediately adjoining, if such **automobile** is not owned by or rented or loaned to **any insured;**

(c) to **bodily injury** or **property damage** arising out of (1) the ownership, maintenance, operation, use, loading or unloading of any **mobile equipment** while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for any such contest or activity or (2) the operation or use of any snowmobile or trailer designed for use therewith;

(d) to **bodily injury** or **property damage** arising out of and in the course of the transportation of **mobile equipment** by an **automobile** owned or operated by or rented or loaned to any **insured;**

(e) to **bodily injury** or **property damage** arising out of the ownership, maintenance, operation, use, loading or unloading of

    (1) any watercraft owned or operated by or rented or loaned to any **insured,** or

    (2) any other watercraft operated by any person in the course of his employment by any **insured;**

but this exclusion does not apply to watercraft while ashore on premises owned by, rented to or controlled by the **named insured;**

GL - 2

DD_INS_00236

(f) to **bodily injury** or **property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

(g) to **bodily injury** or **property damage** due to war, whether or not declared, civil war, insurrection, rebellion or revolution or to any act or condition incident to any of the foregoing, with respect to

    (1) liability assumed by the **insured** under an **incidental contract,** or

    (2) expenses for first aid under the Supplementary Payments provision;

(h) to **bodily injury** or **property damage** for which the **insured** or his indemnitee may be held liable

    (1) as a person or organization engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages, or

    (2) if not so engaged, as an owner or lessor of premises used for such purposes,

    if such liability is imposed

    (i) by, or because of the violation of, any statute, ordinance or regulation pertaining to the sale, gift, distribution or use of any alcoholic beverage, or

    (ii) by reason of the selling, serving or giving of any alcoholic beverage to a minor or to a person under the influence of alcohol or which causes or contributes to the intoxication of any person;

    but part (ii) of this exclusion does not apply with respect to liability of the **insured** or his indemnitee as an owner or lessor described in (2) above;

(i) to any obligation for which the **insured** or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(j) to **bodily injury** to any employee of the **insured** arising out of and in the course of his employment by the **insured** or to any obligation of the **insured** to indemnify another because of damages arising out of such injury; but this exclusion does not apply to liability assumed by the **insured** under an **incidental contract;**

(k) to **property damage** to

    (1) property owned or occupied by or rented to the **insured,**

    (2) property used by the **insured,** or

    (3) property in the care, custody or control of the **insured** or as to which the **insured** is for any purpose exercising physical control;

    but parts (2) and (3) of this exclusion do not apply with respect to liability under a written sidetrack agreement and part (3) of this exclusion does not apply with respect to **property damage** (other than to **elevators**) arising out of the use of an **elevator** at premises owned by, rented to or controlled by the **named insured;**

(l) to **property damage** to premises alienated by the **named insured** arising out of such premises or any part thereof;

(m) to loss of use of tangible property which has not been physically injured or destroyed resulting from

    (1) a delay in or lack of performance by or on behalf of the **named insured** of any contract or agreement, or

    (2) the failure of the **named insured's products** or work performed by or on behalf of the **named insured** to meet the level of performance, quality, fitness or durability warranted or represented by the **named insured;**

    but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the **named insured's products** or work performed by or on behalf of the **named insured** after such products or work have been put to use by any person or organization other than an **insured;**

GL - 3

DD_INS_00237

(n) to **property damage** to the **named insured's products** arising out of such products or any part of such products;

(o) to **property damage** to work performed by or on behalf of the **named insured** arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

(p) to **damages** claimed for the withdrawal, inspection, repair, replacement, or loss of use of the **named insured's products** or work completed by or for the **named insured** or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

## II. PERSONS INSURED

Each of the following is an **insured** under this endorsement to the extent set forth below:

(a) if the **named insured** is designated in the declarations as an individual, the person so designated but only with respect to the conduct of a business of which he is the sole proprietor, and the spouse of the **named insured** with respect to the conduct of such a business;

(b) if the **named insured** is designated in the declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such;

(c) if the **named insured** is designated in the declaration as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such;

(d) any person (other than an employee of the **named insured**) or organization while acting as real estate manager for the **named insured**; and

(e) with respect to the operation, for the purpose of locomotion upon a public highway, of **mobile equipment** registered under any motor vehicle registration law,

   (i) an employee of the **named insured** while operating any such equipment in the course of his employment, and

   (ii) any other person while operating with the permission of the **named insured** any such equipment registered in the name of the **named insured** and any person or organization legally responsible for such operation, but only if there is no other valid and collectible insurance available, either on a primary or excess basis, to such person or organization;

   provided that no person or organization shall be an **insured** under this paragraph (e) with respect to:

   (1) **bodily injury** to any fellow employee of such person injured in the course of his employment, or

   (2) **property damage** to property owned by, rented to, in charge of or occupied by the **named insured** or the employer of any person described in subparagraph (ii).

This insurance does not apply to **bodily injury** or **property damage** arising out of the conduct of any partnership or joint venture of which the **insured** is a partner or member and which is not designated in this endorsement as a **named insured**.

## III. LIMITS OF LIABILITY

Regardless of the number of (1) **insureds** under this endorsement, (2) persons or organizations who sustain **bodily injury** or **property damage**, or (3) claims made or suits brought on account of **bodily injury** or **property damage**, the company's liability under this endorsement is limited as follows:

   **Coverage A** — The total liability of the company for all damages, including damages for care and loss of services, because of **bodily injury** sustained by one or more persons as the result of any one **occurrence** shall not exceed the limit of **bodily injury** liability stated in the declarations as applicable to "each **occurrence**."

   Subject to the above provision respecting "each **occurrence**", the total liability of the company for all damages because of (1) all **bodily injury** included within the **completed operations hazard** and (2) all **bodily injury** included within the **products hazard** shall not exceed the limit of **bodily injury** liability stated in the declarations as "aggregate".

GL - 4

DD_INS_00238

**Coverage B** — The total liability of the company for all damages because of all **property damage** sustained by one or more persons or organizations as the result of any one **occurrence** shall not exceed the limit of **property damage** liability stated in the declarations as applicable to "**each occurrence**".

Subject to the above provision respecting "**each occurrence**" the total liability of the company for all **damages** because of all **property damage** to which this coverage applies and described in any of the numbered subparagraphs below shall not exceed the limit of **property damage** liability stated in the declarations as "aggregate":

(1) all **property damage** arising out of premises or operations rated on a remuneration basis or contractor's equipment rated on a receipts basis, including **property damage** for which liability is assumed under any **incidental contract** relating to such premises or operations, but excluding **property damage** included in subparagraph (2) below;

(2) all **property damage** arising out of and occurring in the course of operations performed for the **named insured** by independent contractors and general supervision thereof by the **named insured**, including any such **property damage** for which liability is assumed under any **incidental contract** relating to such operations, but this subparagraph (2) does not include **property damage** arising out of maintenance or repairs at premises owned by or rented to the **named insured** or structural alterations at such premises which do not involve changing the size of or moving buildings or other structures;

(3) all **property damage** included within the **products hazard** and all **property damage** included within the **completed operations hazard.**

Such aggregate limit shall apply separately to the **property damage** described in subparagraphs (1), (2) and (3) above, and under subparagraphs (1) and (2), separately with respect to each project away from premises owned by or rented to the **named insured.**

**Coverages A and B**—For the purpose of determining the limit of the company's liability, all **bodily injury** and **property damage** arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one **occurrence.**

Any limit of the company's liability stated in this endorsement as "aggregate" shall apply separately to each consecutive annual period comprising the policy period.

## IV. POLICY TERRITORY

This insurance applies only to **bodily injury** or **property damage** which occurs within the **policy territory.**

## V. SUPPLEMENTARY PAYMENTS

The company will pay, in addition to the applicable limit of liability:

(a) all expenses incurred by the company, all costs taxed against the **insured** in any suit defended by the company and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon;

(b) premiums on appeal bonds required in any such suit, premiums on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this endorsement, and the cost of bail bonds required of the **insured** because of accident or traffic law violation arising out of the use of any vehicle to which this endorsement applies, not to exceed $250 per bail bond, but the company shall have no obligation to apply for or furnish any such bonds;

(c) expenses incurred by the **insured** for first aid to others at the time of an accident, for **bodily injury** to which this endorsement applies;

(d) reasonable expenses incurred by the **insured** at the company's request in assisting the company in the investigation or defense of any claim or suit, including actual loss of earnings not to exceed $25 per day.

## VI. DEFINITIONS

When used in this endorsement (including endorsements forming a part hereof):

"**automobile**" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include **mobile equipment;**

GL - 5

**"bodily injury"** means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom;

**"completed operations hazard"** includes **bodily injury** and **property damage** arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the **bodily injury** or **property damage** occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the **named insured**. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

(1) when all operations to be performed by or on behalf of the **named insured** under the contract have been completed,

(2) when all operations to be performed by or on behalf of the **named insured** at the site of the operations have been completed, or

(3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The **completed operations hazard** does not include **bodily injury** or **property damage** arising out of

(a) operations in connection with the transportation of property, unless the **bodily injury** or **property damage** arises out of a condition in or on a vehicle created by the loading or unloading thereof,

(b) the existence of tools, uninstalled equipment or abandoned or unused materials, or

(c) operations for which the classification stated in the policy or in company's manual specifies "including completed operations";

**"elevator"** means any hoisting or lowering device to connect floors or landings, whether or not in service, and all appliances thereof including any car, platform, shaft, hoistway, stairway, runway, power equipment and machinery; but does not include an **automobile** servicing hoist, or a hoist without a platform outside a building if without mechanical power or if not attached to building walls, or a hod or material hoist used in alteration, construction or demolition operations, or an inclined conveyor used exclusively for carrying property or a dumbwaiter used exclusively for carrying property and having a compartment height not exceeding four feet;

**"incidental contract"** means any written (1) lease of premises, (2) easement agreement, except in connection with construction or demolition operations on or adjacent to a railroad, (3) undertaking to indemnify a municipality required by municipal ordinance, except in connection with work for the municipality, (4) side-track agreement, or (5) **elevator** maintenance agreement;

**"insured"** means (1) with respect to coverages A and B any person or organization qualifying as an insured in the "Persons Insured" provision of this endorsement and (2) with respect to other coverages any person or organization qualifying as an insured in the "Persons Insured" provision of the endorsement affording such coverage. The insurance afforded applies separately to each **insured** against whom claim is made or suit is brought, except with respect to the limits of the company's liability;

**"mobile equipment"** means a land vehicle (including any machinery or apparatus attached thereto), whether or not self-propelled, (1) not subject to motor vehicle registration, or (2) maintained for use exclusively on premises owned by or rented to the **named insured**, including the ways immediately adjoining, or (3) designed for use principally off public roads, or (4) designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or permanently attached to such vehicle: power cranes, shovels, loaders, diggers and drills; concrete mixers (other than the mix-in-transit type); graders, scrapers, rollers and other road construction or repair equipment; air-compressors, pumps and generators, including spraying, welding and building cleaning equipment; and geophysical exploration and well servicing equipment;

**"named insured"** means the person or organization named on page 1 of this policy;

GL - 6

DD_INS_00240

"**named insured's products**" means goods or products manufactured, sold, handled or distributed by the **named insured** or by others trading under his name, including any container thereof (other than a vehicle), but "**named insured's products**" shall not include a vending machine or any property other than such container, rented to or located for use of others but not sold;

"**occurrence**" means an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured**;

"**policy territory**" means

(1) the United States of America, its territories or possessions, or Canada, or

(2) international waters or air space, provided the **bodily injury** or **property damage** does not occur in the course of travel or transportation to or from any other country, state or nation, or

(3) anywhere in the world with respect to **damages** because of **bodily injury** or **property damage** arising out of a product which was sold for use or consumption within the territory described in paragraph (1) above, provided the original suit for such damages is brought within such territory;

"**products hazard**" includes **bodily injury** and **property damage** arising out of the **named insured's products** or reliance upon a representation or warranty made at any time with respect thereto, but only if the **bodily injury** or **property damage** occurs away from premises owned by or rented to the **named insured** and after physical possession of such products has been relinquished to others;

"**property damage**" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** during the policy period.

## VII. CONDITIONS

1. **Premium:** An estimated premium for this endorsement has been used as a factor in the computation of the Provisional premium for this policy. The actual premium for the insurance afforded by this endorsement, determined in accordance with the Company's rules, rates, rating plans, premium and minimum premiums applicable to this insurance, shall be included as a factor in the computation of the earned premium for this policy.

The **named insured** shall maintain records of such information as is necessary for premium computation, and shall send copies of such records to the company at the end of the policy period and at such times during the policy period as the company may direct.

2. **Financial Responsibility Laws:** When this endorsement is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded by this endorsement for **bodily injury** liability or for **property damage** liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law. The **insured** agrees to reimburse the company for any payment made by the company which it would not have been obligated to make under the terms of this endorsement except for the agreement contained in this paragraph.

3. **Insured's Duties in the Event of Occurrence, Claim or Suit:**

(a) In the event of an **occurrence**, written notice containing particulars sufficient to identify the **insured** and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the **insured** to the company or any of its authorized agents as soon as practicable.

(b) If claim is made or suit is brought against the **insured**, the **insured** shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(c) The **insured** shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **insured** because of injury or damage with respect to which insurance is afforded under this endorsement; and the **insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The **insured** shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

GL - 7

DD_INS_00241

**4. Action Against Company:** No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this endorsement, nor until the amount of the **insured's** obligation to pay shall have been finally determined either by judgment against the **insured** after actual trial or by written agreement of the **insured**, the claimant and the company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this endorsement to the extent of the insurance afforded by this endorsement. No person or organization shall have any right under this endorsement to join the company as a party to any action against the **insured** to determine the **insured's** liability, nor shall the company be impleaded by the **insured** or his legal representative. Bankruptcy or insolvency of the **insured** or of the **insured's** estate shall not relieve the company of any of its obligations hereunder.

**5. Other Insurance:** The insurance afforded by this endorsement is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the **insured** has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under this endorsement shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the company shall not be liable under this endorsement for a greater proportion of the loss than that stated in the applicable contribution provision below:

(a) **Contribution by Equal Shares.** If all of such other valid and collectible insurance provides for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

(b) **Contribution by Limits.** If any of such other insurance does not provide for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this endorsement for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

**6. Subrogation:** In the event of any payment under this endorsement, the company shall be subrogated to all the **insured's** rights of recovery therefor against any person or organization and the **insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **insured** shall do nothing after loss to prejudice such rights.

**7. Changes:** Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this endorsement or estop the company from asserting any right under the terms of this endorsement; nor shall the terms of this endorsement be waived or changed, except by endorsement issued to form a part of this endorsement, signed by a duly authorized representative of the company.

**8. Assignment:** Assignment of interest under this endorsement shall not bind the company until its consent is endorsed hereon; if, however, the **named insured** shall die, such insurance as is afforded by this endorsement shall apply (1) to the **named insured's** legal representative, as the **named insured**, but only while acting within the scope of his duties as such, and (2) with respect to the property of the **named insured**, to the person having proper temporary custody thereof, as **insured**, but only until the appointment and qualification of the legal representative.

**9. Cancellation:** This endorsement may be cancelled in accordance with the cancellation provisions on page 2 of the policy of which it forms a part.

**10. Declarations:** By acceptance of this endorsement, the **named insured** agrees that the statements in the declarations are his agreements and representations, that this endorsement is issued in reliance upon the truth of such representations and that this endorsement embodies all agreements existing between himself and the company or any of its agents relating to this insurance.

**11.** None of the provisions, stipulations and other terms of the policy to which this endorsement is attached shall apply to insurance hereunder except as expressly provided in this endorsement. All the General Provisions of the policy apply to this endorsement except those specifically stated to apply only to other parts.

GL - 8

DD_INS_00242

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

---

In re:                                    Bankruptcy Case No.:  15-50792

Diocese of Duluth,                        Chapter 11

       Debtor-in-Possession.

---

Diocese of Duluth,

       Plaintiff,

                            Adversary Proceeding No.: 16-05012

v.

LIBERTY MUTUAL GROUP, a Massachusetts
Corporation; CATHOLIC MUTUAL RELIEF SOCIETY
OF AMERICA, a Nebraska corporation; FIREMAN'S FUND
INSURANCE COMPANY, a California corporation;
CHURCH MUTUAL INSURANCE COMPANY,
a Wisconsin corporation and THE CONTINENTAL
INSURANCE COMPANY, an Illinois corporation,

       Defendants.

---

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
### FOR PARTIAL SUMMARY JUDGMENT ON THE NUMBER OF OCCURRENCES

---

       Plaintiff Diocese of Duluth ("Diocese") submits this memorandum of law in support of

its motion for partial summary judgment that the legal standard for determining the number of

occurrences corresponds to the number of times a victim was abused limited to one such

occurrence per-victim, per-priest, per-policy year.

### <u>INTRODUCTION</u>

       The Diocese seeks insurance coverage for hundreds of suits by victims alleging sexual

abuse by priests under successive commercial general liability insurance policies with "per

occurrence" policy limits.  The Diocese now moves the Court for a ruling that the legal standard

for determining the number of occurrences corresponds to the number of times a victim was abused limited to one such occurrence per-victim, per-priest, per-policy year.  A ruling on this issue will enable the parties to quantify the number of available "per occurrence" limits of liability available to compensate the victims, narrow the issues for discovery and trial, and facilitate settlement discussions.

In negligent supervision coverage cases involving multiple victims and priests, courts have adopted a multiple-occurrence approach.  Minnesota courts are likely to do the same.  In determining what constitutes an occurrence, Minnesota courts focus not on the wrongful act that exposes the policyholder to potential liability (e.g., the Diocese's alleged negligent supervision), but rather on the immediate, injury-producing harm (here, the separate acts of abuse or molestation allegedly committed by the Diocese's priests).  In the context of the failure to supervise a pedophilic priest, in particular, the Minnesota Court of Appeals has held that the "occurrence" is the act of abuse.  Where there are multiple acts of abuse, Minnesota courts would conclude there is more than one occurrence for a single victim—even within a single policy year.

Certain insurance policies at issue here, however, have "occurrence deemer" clauses.  Such clauses limit the number of occurrences for each victim repeatedly abused by the same priest in any one policy year to one occurrence per year.  The Diocese agrees that this approach should apply to all of the policies because it is the most reasonable interpretation of the policy language and avoids a situation in which an insurer could face potentially hundreds, if not thousands, of occurrences in a given policy year.

Finally, the fact that the policies permit varying reasonable interpretations as to how to calculate the number of occurrences—an ambiguity that easily could have been avoided had the insurers drafted and sold clear policy language—the number-of-occurrences interpretation requested by the Diocese herein should be adopted.  Accordingly, the Diocese respectfully requests that the Court grant partial summary judgment holding that the legal standard for calculating the number of occurrences is based on the number of victims molested by each priest per year.

## STATEMENT OF FACTS

The only facts of consequence to this motion are the pertinent terms of the commercial general liability policies that the Defendant insurers sold to the Diocese.  These terms provide that that the insurers will pay all sums as damages because of bodily injury caused by an "occurrence."  *See, e.g.*, Declaration of James R. Murray dated December 16, 2016 ("Murray Decl., Ex. A at DD_INS_00172.  The policies contain similar definitions of the term, "Occurrence."  For example, a policy procured from ("Liberty Mutual") defines occurrence as:

> an accident or a continuous or repeated exposure to conditions which result during the policy period in personal injury, including death at any time resulting therefrom, or injury to or destruction of tangible property, including the loss of use thereof, which is accidentally caused.  All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence

*Id*. Ex. A at DD_INS_00178.  A policy from Firemen's Insurance Company of Newark, N.J. ("CNA") defines occurrence as:

> an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the Insured

*Id.* Ex. B at DD_INS_00241.

As shown above,   certain policies  contain a so-called "occurrence deemer clause," which states that:  "All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence."  *Id*. Ex. A at DD_INS_00178. The question before this Court is the proper interpretation of these  clauses in determining the method for calculating the number of "occurrences."

**ARGUMENT**

I.   **THE LEGAL STANDARD FOR CALCULATING THE NUMBER OF
     OCCURRENCES IS BASED ON THE NUMBER OF VICTIMS MOLESTED BY
     EACH PRIEST PER YEAR**

    A.   **Determining the Test for Calculating the Number of Occurrences is a Pure
     Question of Law Appropriate for Summary Adjudication**

"Interpretation of an insurance policy is a question of law[.]"  *Travelers Indem. Co. v.
Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006) (citing *Thommes v.
Milwaukee Ins. Co.*, 641 N.W.2d 877, 879 (Minn. 2002)).  Here, the Court is being asked to
interpret the insurance policies to define the correct test for calculating the number of
occurrences.  This is a legal question resolvable as a matter of law on summary judgment.  *See*,
*e.g*, *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins.*, 150 F.3d 526, 528-29 (5th Cir. 1998)
("*H.E.B.*"); *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
991 N.E.2d 666, 672 (N.Y. 2013).

    B.   **A Minnesota Court Would Determine the Number of Occurrences Based on
     the Immediate, Injury-Causing Harm – Not the Alleged Wrongful Acts**

No reported Minnesota state court decision has decided the standard for determining the
number of occurrences in the context of claims alleging negligent hiring or supervision arising
from sexual molestation and abuse.  Courts in other jurisdictions that have considered the
question have concluded in insurance coverage cases involving the molestation of multiple
victims or multiple perpetrators that there are multiple occurrences.  *See, e.g., H.E.B.*, 150 F.3d
at 532.  In a case, such as this, involving multiple victims and perpetrators, a Minnesota court
would adopt a multi-occurrence approach.

The standard for quantifying occurrences is tied to what constitutes an occurrence.  Under
Minnesota law, the term "occurrence" refers to the injury-causing harm that triggers an
occurrence-based insurance policy, such as a commercial general liability ("CGL") policy.
Minnesota has adopted the "actual injury" or "injury-in-fact" theory in determining which
insurance policies have been triggered by an occurrence.  *Jenoff, Inc. v. New Hampshire Ins. Co.*,

4

558 N.W.2d 260, 262 (Minn. 1997).  Under this rule, "the time of the occurrence is not the time

the wrongful act was committed but the time the complaining party was actually damaged." *In re*

*Silicone Implant Ins. Cov. Litig.*, 667 N.W.2d 405, 415 (Minn. 2003) (citations and quotations

omitted).[1]  "Thus, under the actual injury trigger rule, only those policies in effect when the

bodily injury or property damage occurred are triggered."  *Id.*

> Minnesota courts have recognized that there can be multiple occurrences.  As the

Minnesota Court of Appeals explained:

> This court refined the actual-injury rule in situations where there is more than one
> occurrence of injury because "property damage result[ed] from continuous or
> repeated conditions of exposure," where there are different insurance policies in
> effect at the different times the damage occurs, or where there is more than one
> party that possibly caused the damage.

*Donnelly Bros. Constr. Co. v. State Auto Prop. & Cas. Ins. Co.*, 759 N.W.2d 651, 656 (Minn. Ct.

App. 2009) (quoting *Indus. Steel Container v. Fireman's Fund Ins. Co.*, 399 N.W.2d 156, 159

(Minn. App. 1987) (holding that there can be more than one occurrence and that more than one

policy can be on the risk)); *Sand Cos., Inc. v. Gorham Hous. Partners III, LLP*, No. A10-113,

2010 WL 5154378, at *11 (Minn. Ct. App. Dec. 21, 2010) ("as long as one or more occurrences .

. . occurred during [the insurer's] policy period, [the insurer] is liable").

> Consistent with Minnesota's actual injury trigger rule, an occurrence in the molestation

context takes place when the abuse occurs.  In *Redeemer Covenant Church v. Church Mutual*

---

[1] For example, in *Jenoff*, a company installed a heat detection and fire suppression system in a
grain elevator in 1976.  A fire destroyed the grain elevator in 1993, and an action was brought
against the company, alleging that it had negligently designed, manufactured, and installed the
system.  The company sought coverage under its 1976-1977 liability policy.  The Minnesota
Supreme Court confronted the following question: "whether an 'occurrence' is when the
complaining party suffers damage or, whether it is when the act is performed ultimately resulting
in liability, even if the damage caused by the act is not suffered until after the policy has
expired[?]"  *Jenoff*, 558 N.W.2d at 262.  The court answered as follows: "an 'occurrence' within
the meaning of an indemnity policy, is not the time when the wrongful act was committed, but
rather, it is the time when the complaining party was actually damaged."  *Id.* at 263.  Therefore,
because the fire that destroyed the grain elevator took place outside the period of the umbrella
policy, the court concluded that the company was not entitled to coverage.

5

*Insurance Co.*, for instance, a church sought coverage under a CGL policy for claims alleging that it had negligently supervised a preacher who molested the claimants. 567 N.W.2d 71 (Minn. Ct. App. 1997). The church asserted that the CGL policy was triggered based on "the view that claimants' discovery of their injuries during the policy period was itself an occurrence." *Id*. at 81. The trial court granted summary judgment for the insurer on the basis that the "'occurrences' and 'bodily injury' . . . took place prior to the policy periods." *Id*. On appeal, the Minnesota Court of Appeals affirmed, stating that "[a]n occurrence is 'the time the complaining party was actually injured'" and "as a matter of law one is injured if one is sexually abused and that it is knowledge of the abuse, not knowledge that the abuse caused injury, that triggers an action for sexual abuse." *Id*. at 81-82 (citing *Jenoff*, 558 N.W.2d at 261 and *Blackowiak v. Kemp*, 546 N.W.2d 1, 3 (Minn. 1996) ("as a matter of law one is 'injured' if one is sexually abused").[2]

The foregoing principles make clear that, under Minnesota law, each act of abuse constitutes a separate "occurrence." Thus, where there is more than one instance of abuse, there is more than one occurrence. This means that a victim abused by the same priest more than once in a single year would yield multiple occurrences in that year. This is a reasonable approach recognized in other jurisdictions. *See Diocese of Brooklyn,* 991 N.E.2d at 675 n.6 ("each incidence of abuse constitutes a single occurrence"). Because certain policies here have a so-called "occurrence deemer" clause, however, the Diocese agrees that it is reasonable in this case to treat the multiple instances of abuse of a victim by the same priest in a given year as one occurrence. This approach may also reduce evidentiary complexities. Thus, if two priests each abused the same victim twice in a single year there would be two occurrences. If, in the next year, the two priests each abused the victim twice again, there would be a total of four

---

[2] Insurers sometimes contend that the number of occurrences should be based on the acts of negligent hiring or supervision, rather than each instance of abuse. Their goal is to limit the number of occurrences and thus minimize the insurers' coverage obligations to the Diocese, and, ultimately, to limit the victims' recovery. In this case, however, Minnesota's law forecloses this line of argument because it clearly distinguishes between the wrongful acts (i.e., the negligent hiring or supervision) and the instances of abuse (i.e., the occurrences). *See Redeemer Covenant Church*, 567 N.W.2d at 81-82.

6

occurrences—two in the first year and two in the second year.  Consistent with Minnesota law
and the policy language, the test for the number of occurrences in this case is based on the
number of victims molested by each priest per year.

### C.      The "Neither Expected Nor Intended" And "Accidentally Caused" Language in the "Occurrence" Definitions Similarly Focus on Injury-Producing Harm

Certain insurance policies at issue here require the insurers to pay all sums as damages
because of bodily injury caused by an "occurrence" defined (however ambiguously) as an
"accident, including continuous or repeated exposure to conditions, which results in bodily injury
or property damage neither expected nor intended from the standpoint of the insured."  Ex. B at
DD_INS_00241 (Emphasis added).  Other policies refer to an "accident or continuous or
repeated exposure to conditions which result during the policy period in personal injury . . .
which is accidentally caused."  Ex. A at DD_INS_00178.

Under Minnesota law, a policy and endorsements should be construed, if possible, as to
give effect to all provisions.  *Grinnell Mut. Reinsurance Co. v. Villanueva*, 37 F. Supp. 3d 1043,
1048 (D. Minn. 2014).  If the number-of-occurrences inquiry focuses on acts other than the acts
of abuse and fails to ask whether that injury-producing harm was "neither expected nor intended"
or "accidentally caused," the occurrence clause is not given its full effect.  This is because the
key "occurrence" question itself is whether the alleged negligent policyholder "neither expected
nor intended" or "accidentally caused" the injury-producing harm.  *See, e.g.*, *Iowa Kemper Ins.
Co. v. Stone*, 269 N.W.2d 885, 887 (Minn. 1978) ("The 'intent' required to exclude coverage is
neither the 'intent *to act*' nor the 'intent to cause the *specific* injury complained of.'  Rather, it is
the 'intent to *cause bodily injury*' . . . .").

### D.      The Eighth Circuit's Decision in *Winona* Is Not Controlling

In *Diocese of Winona v. Interstate Fire & Casualty Co.* ("*Winona*"), the U.S. Court of
Appeals for the Eighth Circuit addressed the number of occurrences in an insurance coverage
case in which an archdiocese sought coverage for claims alleging negligent supervision of a
priest who repeatedly molested the claimant over a period of years.  89 F.3d 1386 (8th Cir. 1996).

7

The Eighth Circuit held that the repeated instances of abuse constituted one occurrence per policy period.  *Id*. at 1390 n.5, 1396 n.11.  The reasoning of *Winona*, decided two decades ago, should not be followed in this case because it does not reflect current Minnesota law governing occurrences and, in any event, *Winona* is factually distinguishable from this case.

1.    **Minnesota Law Has Developed Since *Winona***

In *Winona*, a claimant brought suit against the Archdiocese of St. Paul, alleging that it had negligently and recklessly supervised the priest who had abused the claimant.  The archdiocese brought suit against its insurers, seeking coverage under consecutive CGL policies.  Some of the policies had self-insured retentions ("SIRs") that required the archdiocese to pay up to $100,000 per occurrence out of its own pocket before the insurers owed any insurance proceeds from their policies.  The trial court found that the repeated instances of abuse by the priest "constituted a number of occurrences which merged into 'one continuing occurrence'" and, as such, each of the policies on the risk over the course of the abuse had to provide coverage. *Id*. at 1390.

In reaching this single-occurrence ruling, the trial court relied on the Minnesota Supreme Court's decision in *Northern States Power Co. v. Fidelity & Casualty Co.*, 523 N.W.2d 657 (Minn. 1994) ("*NSP*").  In *NSP*, the insured sought coverage under policies, including five consecutive CGL policies in effect from 1958 to 1973, for costs of complying with an order requiring it to clean up property contaminated by operations at a coal-tar gasification site.  Like the policies in *Winona*, the policies included SIRs ranging from $25,000 to $100,000 per occurrence.  To determine which policies were triggered, the *NSP* court applied a "continuous trigger" whereby damages that happen over multiple policy periods are "presume[d]" to be continuous from "the point of the first damage to the point of discovery or cleanup."  523 N.W.2d at 664.  Having determined that the contamination was a "continuous process," the *NSP* court applied the pro rata allocation rule, which distributes damage evenly over the period of time from the first contamination to the end of the last triggered policy.  *Id*.  Turning to the

8

number of occurrences, the *NSP* court held that there was one occurrence during each policy period, reasoning that "the discharge or escape of . . . contaminates has been so continuous and repetitive that the unidentified individual instances have merged into one continuing occurrence." *Id*.  As a result, the insured was obligated to pay only one SIR per policy period.

In the appeal of the *Winona* case, an insurer contended that, since there was one continuous occurrence, the insurer should be responsible for at most one insurance policy limit. 89 F.3d at 1390 n.5.  The Eighth Circuit disagreed, finding that the insurer had to provide coverage under each policy because injury took place during each policy period.  *Id*. at 1390 n.5, 1396.  In reaching this conclusion, the Eight Circuit, citing *NSP*, drew a distinction between the "occurrence" and the "injury," explaining that "the occurrence is the continuous and repeated exposure of [the claimant] to the negligent supervision of [the priest]" while "[t]he abuse is the actual injury, not the occurrence."  *Id*. at 1390 n.5.  Thus, the court stated, "the time of the occurrence producing the injury is irrelevant to the triggering of the policy;" rather, "it is the time of the actual injury within the effective dates of the policy which triggers the policy."  *Id*. Because injury took place in each policy period, the Eight Circuit found that each of the insurer's policies was triggered.  Having found the insurance policies consecutively liable, the court, again following *NSP*, applied pro rata allocation for allocating damages among the insurers according to each insurer's time on the risk.  *Id*. at 1396.

Turning to the number of occurrences, the Eight Circuit stated that the trial court's single occurrence ruling was relevant to determining the number of SIRs that the insured had to pay in each policy period.  *Id*.  at 1396 n.5.  The court stated that *NSP* "create[s] a legal fiction that a single, continuous occurrence spanning multiple policy periods constitutes a single occurrence in each policy period."  *Id*.  Because there was only one occurrence, the court concluded that the archdiocese had to pay only one SIR per policy period.  *Id*. 1390 n.5, 1396 n.11.

After *Winona* and *NSP* were decided, however, the Minnesota Supreme Court has rejected the legal principles underlying the rulings in *Winona* and *NSP* on trigger, allocation, and number of occurrences.

9

First, the Minnesota Supreme Court reaffirmed that Minnesota adheres to the actual injury trigger and "has explicitly rejected the continuous trigger rule." *In re Silicone Implant Ins. Cov. Litig.*, 667 N.W.2d at 414.

Second, contrary to the *Winona* court's effort to separate the occurrence from the injury, the Minnesota Supreme Court clarified that the occurrence refers, not to the wrongful act, but rather to the injury-causing harm, which, in the molestation context, is the act of abuse. *See id.* at 416; *Redeemer Covenant Church*, 567 N.W.2d at 81-82.

Third, the Minnesota Supreme Court rejected pro rata allocation in all but the most limited situations.  Under current law, a court must first consider in cases of continuous injury, whether the continuous injury arose from some "discrete and identifiable event." *In re Silicone Implant Ins. Cov. Litig.*, 667 N.W.2d at 421. If it does, only the policies on the risk at the time of that event are liable for all sums arising from the event. *Id.*  Pro rata allocation is only appropriate in the absence of a discrete and identifiable event in "difficult cases" where "damage is both continuous and so intermingled as to be practically indivisible." *Id.* at 420.

These unequivocal holdings from Minnesota's highest state court after the rulings in *Winona* and *NSP* make clear that a Minnesota court is precluded as a matter of *stare decisis* from following them, particularly, in a case like this one, where injury can be traced to ***discrete and identifiable events***, namely acts of abuse. Because *Winona* and *NSP* are not grounded in current Minnesota law, as determined by the Minnesota Supreme Court, neither is binding on this court. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).

Two cases decided after *Winona* and *NSP* illustrate the current state of Minnesota law.  In *SCSC Corp. v. Allied Mutual Insurance Co.*, 536 N.W.2d 305 (Minn. 1995), a company sought

10

coverage under CGL policies for the costs of complying with requirements to remediate soil and

groundwater contamination.  Before the trial court, the jury concluded that the contamination

arose from a spill in August 1977 and that the resulting, subsequent damage was not divisible.

*Id*. at 310, 318.  On appeal, the court addressed whether the costs should be allocated pro rata to

each insurance policy on the risk.  *Id*. at 317.  Based on the jury's findings that the damage arose

from "a single event in 1977," the Minnesota Supreme Court ruled that the "only covered

'occurrence' was the 1977 spill."  *Id*. at 318.  As a result, only those insurers that sold policies on

the risk in 1977 were obligated to provide coverage.  *Id*.  "This result," the court explained, "is

consistent with the actual injury theory."  *Id*.

        In the second case, *In re Silicon Implant Insurance Coverage Litigation*, a manufacturer

of silicone breast implants sought coverage under CGL policies in connection with thousands of

suits brought against it alleging that the implants caused continuous injuries to recipients.  667

N.W.2d 405.  The trial court determined that injury occurred at or about the time of the implant,

*id.* at 411, and thereafter injuries consistently re-occurred, *id*.  The trial court applied the

continuous trigger, finding that the injury to each recipient continued after the implantation, and

determined that the manufacturer's losses should be allocated pro rata by time on the risk

beginning with the time of implantation and extending until the end of the period when the

policies were in place.  *Id*. at 409, 411.  On appeal, the Minnesota Supreme Court reversed the

trial court's trigger and allocation rulings.  The court found that the trial court should have

applied the injury-in-fact trigger, noting that Minnesota has rejected the continuous trigger rule.

*Id*. at 414.  Because damage began at or about the time of implantation, the court found that the

injury-in-fact trigger dictated that the policies were triggered at or about the time of implantation.

*Id.* at 417.  The court then determined that each implantation was "a readily identifiable discrete

event from which all of the plaintiff's injuries arose."  *Id*. at 421-422.  Accordingly, the court

held that it was improper to allocate the losses over multiple policy periods.  *Id*.  The court

instead held that "those insurers on the risk at the time of implantation are liable up to the limits

11

of their respective policies for [the manufacturer's] losses arising from that implantation." *Id.* at 422.

These cases confirm that Minnesota law focuses on discrete, identifiable, injury-causing events for purposes of determining what constitutes an occurrence, which polices are triggered, and how losses are allocated. It readily follows from the legal principles applied in each of these cases that Minnesota law determines the number of occurrences based on the number of discrete, identifiable events that trigger the policies—here, each alleged instance of abuse.

## 2.  *Winona* Is Factually Distinguishable

Even assuming *arguendo* that *Winona* was still good law, it should be limited to its specific factual context. As explained above, the *Winona* court addressed the number of occurrences in the context of a single claimant who had been abused by one priest. In contrast, this case involves multiple claimants who allege that they were abused by multiple priests. Second, the insurance policies in *Winona* included SIRs. This led the court to conclude that finding multiple occurrences would require the insured to pay multiple SIRs, thus significantly reducing coverage.[3] In contrast, the policies at issue in this case do not have SIRs and a finding of multiple occurrences would have the opposite effect of increasing coverage that will directly benefit the alleged victims.

Because of these factual differences with the record before it, the *Winona* court did not address the methodology for calculating the number of occurrences where, as here, there are multiple victims and priests, and anything suggesting that its single occurrence ruling might apply in such a situation is, at best, dicta. Thus, *Winona* is neither legally nor factually apposite here.

---

[3] The Eight Circuit found persuasive the reasoning in *Uniroyal, Inc. v. Home Ins. Co.*, 707 F. Supp. 1368 (E.D.N.Y. 1988), where the court stated that "an ongoing exposure to a hazardous condition must be treated as a single, continuous occurrence to avoid the absurd situation where a condition causing hundreds of thousands of injuries would constitute hundreds of thousands of occurrences, forcing the insured to pay for hundreds of thousands of SIRS." *Uniroyal* is inconsistent with current Minnesota law and factually distinguishable for the same reasons that *Winona* is.

12

E.      **Factually and Legally Analogous Foreign Authorities Similarly Support a Multiple-Occurrence Test in Negligent Supervision Contexts**

No reported Minnesota decision has addressed the **_number_** of occurrences issue in a coverage dispute stemming from a negligent supervision claim in particular.  Foreign courts have, and the Court may wish to consult them.  In sum, these authorities, which also address "occurrence deemer clauses" like that in the insurance policies, hold that the number of occurrences is calculated on a per-victim, per-priest, per-policy year basis.  In the *Society of the Roman Catholic Church v. Interstate Fire & Casualty Co.* ("*Diocese of LaFayette*"), for example, the Fifth Circuit concluded that there are multiple occurrences for each policy year and for each victim-again, looking to the injury-producing conduct:

> When a priest molested a child during a policy year, there was both bodily injury and an occurrence, triggering policy coverage.  All further molestations of that child during the policy period arose out of the same occurrence.  **_When the priest molested the same child during the succeeding policy year, again there was both bodily injury and an occurrence.  Thus, each child suffered an "occurrence" in each policy period in which he was molested_**.

26 F.3d 1359, 1365 (5th Cir. 1994) (emphasis added).  The Court reasoned that a "subsequent molestation, occurring outside the policy period is not a consequential damage of the previous molestation; it is a new injury, with its own resulting damages."  *Id*.  Whereas, subsequent molestations of the same child during the same policy year do not give rise to additional occurrences.  *Id*.

A nearly identical ruling and analysis was set forth by the Ninth Circuit in the *Interstate Fire & Casualty Co. v. Archdiocese of Portland*, 35 F.3d 1325 (9th Cir. 1994).  There, the Court held that the carrier was liable for four occurrence limits under Oregon law when a claimant was subjected to separate abuse in four successive policy periods.  The Court looked to each "exposure of the [claimant] to the negligently supervised priest," *id*. at 1330 (emphasis in original), reasoning that:

> [a]lthough the definition of occurrence provides that multiple exposures stemming from the same general conditions can constitute a single occurrence, the insuring clause makes it clear that this is true only of exposures incurring **_during the policy_**

13

***period***.  Accordingly, even though it is undisputed that all of the molestation
suffered by the [claimant] stem from his exposure to "the same general conditions
existing at . . . one location.  The clear import of the policy language, as applied to
the facts here is that the [claimant's] exposure to the negligently supervised priest
in each of the four different policy periods constituted a separate occurrence.

*Id.* at 1329-30 (emphasis in original).  *See also Roman Catholic Diocese of Joliet, Inc. v.*

*Interstate Fire Ins. Co.*, 685 N.E,.2d 932, 939 (Ill. App. 1997) (holding that "where, as here, the

negligent supervision of a priest manifests itself as abuse in multiple policy periods, the

negligent supervision constitutes an occurrence in each policy period and each policy's coverage

is triggered . . . .") (emphasis added).

In *H.E.B.*, the Fifth Circuit concluded that two sexual assaults on different children on

two different days by the same negligently supervised employee constituted two occurrences.

150 F.3d 526 (5th Cir. 1998).  The Court reviewed and analyzed the *Diocese of LaFayette* and

*Archdiocese of Portland*, among others, and reasoned that:

each child's injuries are independent and caused by the separate acts of sexual
abuse.  We agree with the Ninth Circuit that "the terms of the policy make clear
that negligent supervision alone, whether ongoing or not, would not trigger any
obligation on the part of the insurers.  ***Rather it is the [] 'exposure' of the boy to***
***the negligently supervised priest, resulting in injury, that provides the basis for***
***indemnification.***"

*Id.* at 534 (quoting *Archdiocese of Portland*, 35 F.3d at 1329) (emphasis added).

In *Diocese of Brooklyn*, the Court of Appeals of New York ruled that the "each incidence

of abuse constitutes a single occurrence."  991 N.E.2d at 675 n.5.  There, the victim was

molested by a priest on several occasions over several years.  Reversing the trial court's

summary judgment finding of one occurrence, the court, applying New York's "unfortunate

event test," rejected the assertion that there was one occurrence based on the diocese's negligent

supervision of the priest:

. . . contrary to the Diocese's and dissent's view that the negligent supervision
was the sole causal factor, and thus requires a finding of a single occurrence, the
unfortunate event test requires us to focus on the nature of the incident[s] giving
rise to damages . . . . cause should not be conflated with the incident . . . .
Accordingly, where, as here, each incident involved a distinct act of sexual abuse
perpetrated in unique locations and interspersed over an extended period of time,

14

it cannot be said . . . that these incidents were precipitated by a single causal continuum and should be grouped into one occurrence.

*Id*. at 673 (quotations and citations omitted).  In addition, the court rejected the assertion that the reference to "'continuous or repeated exposure to substantially the same general harmful conditions'" compelled the finding of a single occurrence.  *Id*. at 673.  It reasoned that sexual abuse does not "fit neatly" with such wording and that the "***argument that the parties intended to treat numerous, discrete sexual assaults as an accident constituting a single occurrence involving 'conditions' is simply untenable***."  *Id*. at 674

The Florida Supreme Court's 2003 opinion in *Koikos v. Travelers Ins. Co.* is similarly instructive. 849 So. 2d 263 (Fl. 2003).  That case involved one round of shootings of multiple victims at the insured's restaurant where the restaurant was sued on a negligent security claim.  The court, on review of a summary judgment ruling, construed the same occurrence language as here and held that there was an occurrence for each shooting of a victim, not one occurrence for the alleged negligent security:

> To support its argument, Travelers points to the "continuous or repeated exposure" clause in the definition of "occurrence" as limiting language.  Travelers argues that in this case, the "accident" that caused the bodily injury to Armstrong and Harris was their continuous "exposure to substantially the same general harmful condition" – i.e., Koikos's negligent failure to keep his premises safe.  ***We disagree***.

849 So. 2d at 267 (emphasis added).

*Koikos* noted that this clause—the "continuous or repeated exposure" clause—was added to ***broaden coverage***, not limit it.  *Id*. (relying on Florida decision summarizing 7A Appleman, Insurance Law and Practice § 4492 (1979)).  It was meant for "ongoing exposure to harmful environmental phenomena, and not to an insured's tortious omission."  *Id*. at 268 (citing *Metropolitan Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 765 A.2d 891 (Conn. 2001).  The court concluded "that the inclusion of the [clause] does not restrict the definition of 'occurrence' but rather expands it by including ongoing and slowly developing injuries, such as those in the field

15

of toxic torts." *Id.*  In rejecting the carrier's argument that failure to provide security constitutes

a single occurrence, the court noted that:

> [t]he victims were not "exposed' to the negligent failure to provide security.  If
> the victims were "exposed" to anything, it was the bullets fired from the intruder's
> gun.

*Id*. (citing *H.E.B.*, 150 F.2d at 533; *Archdiocese of Portland*, 35 F.2d at 1329).

Finally, the Florida Supreme Court in *Koikos* found further support from the fact that it

too is a jurisdiction that focuses on the injury-producing harm.  Like Minnesota, Florida's cause

test focuses "on the immediate cause—that is the act that causes the damage—rather than the

underlying tort—that is the insured's negligence." *Id*. at 271.  This, the court concluded, is

consistent with both the provision of the applicable policies as well as other policy forms. *Id*.

As a result, the court held:

> consistent with the "cause theory," that in the absence of clear language to the
> contrary, when the insured is being sued for negligent failure to provide security,
> ***"occurrence" is defined by the immediate injury-producing act and not by the
> underlying tortious omission***.  Thus, in this case, the immediate causes of the
> injuries were the intervening intentional acts of the third party - the intruder's
> gunshots.

*Id*. at 271-72 (footnote omitted) (emphasis added).

Accordingly, the result under Minnesota law—one "occurrence" for each separate injury-

producing act—gains support by the weight of foreign authorities addressing the issue in

analogous cases involving negligent supervision claims.

### F.   Giving Proper Effect to the So-Called "Occurrence Deemer Clause" in the Policies Only Limits the Number of Occurrences to One Per Victim, Per Priest, Per Policy Year

The insurers may try to argue that the "occurrence deemer clause" has the effect of

limiting the total number of occurrences to one.  But this argument has been squarely rejected

again and again by courts.  *Archdiocese of Portland*, 35 F.3d at 1329.  Properly applied in

negligent supervision cases such as this one, this deemer language only limits the Diocese to one

16

occurrence per-victim, per-priest, per-policy year.  *Id.*; *Diocese of LaFayette*, 26 F.3d at 1363-

64; *H.E.B.*, 150 F.3d at 533; *Diocese of Joliet*, 685 N.E.2d at 938.

Thus, whereas without this language, Minnesota law would permit a finding of a separate

occurrence for each and every act of abuse (even within one policy year), the effect of the clause

here is to restrict the number of occurrences to one as to each priests' victims in each policy year.

For example, if one victim was abused 10 times in one policy year by the same priest, there

would be only one occurrence.  However, if that same victim were abused in a different policy

year or by another priest in the same policy year, there would be an additional occurrence.

### G.    All Ambiguities Created by the Policy Definition of "Occurrence" are to be Resolved in Favor of the Diocese's Interpretation of a Multiple-Occurrences Calculation

Minnesota rules regarding construction of insurance policies are clear and well

established.  "If the language of an insurance contract is unambiguous, it must be given its plain

and ordinary meaning."  *Bloomington Steel*, 718 N.W.2d at 894.  "But if the language is

ambiguous, it will be construed against the insurer, as drafter of the contract."  *Id.* (citing

*Progressive Specialty Ins. Co. v. Widness*, 635 N.W.2d 516, 518 (Minn. 2001)).  "[C]overage

provisions are construed according to the expectations of the insured and exclusions are

construed narrowly."  *Am. Family Ins. Co. v. Walser*, 628 N.W.2d 605, 609 (Minn. 2001) (citing

*Atwater Creamery Co. v. W. Nat'l Mut. Ins. Co.*, 366 N.W.2d 271, 276-77 (Minn. 1985));

*Glarner v. Time Ins. Co.*, 465 N.W.2d 591, 596 (Minn. Ct. App. 1991) ("Likewise, exclusions in

insurance contracts are read narrowly against the insurer.").  "An insurer has the burden of

proving that a policy exclusion applies."  *Henning Nelson Const. Co. v. Fireman's Fund*

*American Life Ins. Co.*, 383 N.W.2d 645, 652 (Minn. 1986).

An insurance policy is ambiguous "if it is susceptible to two or more reasonable

interpretations."  *Carlson v. Allstate Ins. Co.*, 749 N.W.2d 41, 45 (Minn. 2008).  Ambiguous

terms are construed against the insurer, as the drafter of the contract, and Minnesota courts

"construe such terms in favor of providing coverage to the insured."  *Eng'g & Const.*

*Innovations, Inc. v. LH Bolduc Co.*, 825 N.W.2d 695, 705 (Minn. 2013) (citing *Jenoff, Inc. v. N.H. Ins. Co.*, 558 N.W.2d 260, 262 (Minn. 1997)).  Minnesota courts read the terms of an insurance contract "in the context of the entire contract," and do not construe terms so strictly "as to lead to a harsh and absurd result."  *Emp'rs Mut. Liab. Ins. Co. of Wis. v. Eagles Lodge of Hallock, Minn.*, 165 N.W.2d 554, 556 (Minn. 1969).  Minnesota courts will not adopt a "construction of an insurance policy which entirely neutralizes one provision  . . . if the contract is susceptible of another construction which gives effect to all its provisions and is consistent with the general intent." *Wyatt v. Wyatt*, 58 N.W.2d 873, 875 (Minn. 1953); *L.H. Bolduc Co.*, 825 N.W.2d at 705.

Here, the term "occurrence" does not unambiguously tell us how to calculate the number of occurrences for limits purposes. *See also Koikos*, 849 So. 2d at 273 ("The policy definition of occurrence . . . is susceptible to more than one reasonable interpretation" referring to different "causes" of injury); *Lee v. Interstate Fire & Cas. Co.*, 86 F.3d 101, 104 (7th Cir. 1996) (explaining that "'continuous or repeated exposure to conditions' sounds like language designed to deal with asbestos fibers in the air, or lead-based paint on the walls, rather than with priests and choirboys").  At the very best for the Defendant insurers, the term is ambiguous—meaning both Diocese's and the insurers' interpretation are reasonable—and therefore, must be construed in favor of coverage.  It is not enough for the insurers to show an expansive coverage-defeating interpretation of the term is plausible or even the preferred reading of the contract.  The Diocese's interpretation of the term is at least "rational" and thus must be applied.  This result is even more compelling here, where the occurrence language is found in the coverage grants of the insurance policies, as coverage clauses are interpreted broadly to effectuate the expectations of the insured. *Walser*, 628 N.W.2d at 609.

Had the insurers wished to reduce the liability limits in its policies to some particular theory or interpretation of how to calculate the number of occurrences, "[they] could have drafted clear policy language to accomplish that result." *Koikos*, 849 So.2d at 272.  By way of

18

example only, the insurers could have included either version of the following language in its

policies:

> [Occurrence means] all losses of damages that are attributable directly or
> indirectly to one cause of to one series of similar causes.  All such losses will be
> added together and the total amount of such losses will be treated as one
> occurrence irrespective of the period of time or area over which such losses occur.

*Koikos*, 849 So.2d at 272 (quoting policy language from other case);

> or

> All acts of sexual misconduct of by one person, or two or more persons acting
> together, or any breach of duty causing or contributing to such acts will be
> considered one occurrence in determining our liability.

*H.E.B.*, 150 F.3d at 531 (such language, if included, would require treating "both incidents of

sexual abuse as one occurrence").  None of the policies at issue include such language (or

anything similar), and the Court should refuse to read such language into the policies.  *See*

*Nerud v. Nat'l Family Ins. Corp.*, CX-94-1702, 1994 Minn. App. LEXIS 1245, at *4-5 (Ct. App.

Dec. 13, 1994) ("this court will not rewrite the insurance contract to provide an exclusion that the

insurer could have, but did not, include"); *Bergen v. Grinnell Mut. Reinsurance Co.*, 946 F.

Supp. 2d 867, 873 (D. Minn. 2013) ("The Court simply cannot read a provision into the policy

that does not exist").

## <u>CONCLUSION</u>

For the reasons stated, the Diocese's motion should be granted and the Court should hold

as a matter of law that the legal standard for determining the number of occurrences corresponds

to the number of times a victim was abused limited to one such occurrence per-victim, per-priest,

per-policy year.

19

Dated:  December 19, 2016

Respectfully submitted,

**BLANK ROME LLP**

By:  /s/ *James R. Murray*
    James R. Murray (admitted *pro hac vice*)
    1825 Eye Street NW
    Washington, DC 20006
    Telephone: (202) 420-3409
    Facsimile: (202) 420-2201
    jmurray@blankrome.com

    Jared Zola (admitted *pro hac vice*)
    The Chrysler Building
    405 Lexington Avenue
    New York, New York 10174
    Telephone: (212) 885-5209
    Facsimile: (917) 591-8538
    jzola@blankrome.com

    -and-

**GRAY PLANT MOOTY**
 **MOOTY & BENNETT, P.A.**

By:  /s/ *Phillip L. Kunkel*
    Phillip L. Kunkel (#058981)
    Nicholas N. Nierengarten (#079169)
    1010 West Germain Street, Suite 500
    Saint Cloud, MN 56301
    Telephone: (320) 202-5335
    Facsimile: (320) 252-4482
    Phillip.kunkel@gpmlaw.com
    Nicholas.nierengarten@gpmlaw.com

    *Counsel for Diocese of Duluth*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

In re:                                                    Bankruptcy Case No.:  15-50792

Diocese of Duluth,                                        Chapter 11

            Debtor-in-Possession.

Diocese of Duluth,

            Plaintiff,

                                                          Adversary Proceeding No.: 16-05012

v.

  LIBERTY MUTUAL GROUP, a Massachusetts
  corporation; CATHOLIC MUTUAL RELIEF SOCIETY
  OF AMERICA, a Nebraska corporation; FIREMAN'S FUND
  INSURANCE COMPANY, a California corporation;
  CHURCH MUTUAL INSURANCE COMPANY,
  a Wisconsin corporation and THE CONTINENTAL
  INSURANCE COMPANY, an Illinois corporation,

            Defendants.

        I, Abigail M. McGibbon, hereby certify that on the 19th day of December 2016, I caused

a true and correct copy of the foregoing *Notice of Motion and Motion For Partial Summary

Judgment on the Number of Occurrences, Memorandum of Law and Proposed Order* to be

served on the following parties in the manner indicated below.

**VIA US Mail**
**Catholic Mutual Relief Society of America**
Everett J. Cygal
233 South Wacker Drive
Suite 600
Chicago, IL 60606
ecygal@shiffhardin.com

**VIA US Mail**
**The Continental Insurance Company**
Laura McNally
2321 North Clark Street
Suite 2300
Chicago, IL 60654
 lmcnally@loeb.com

**VIA US Mail**
**Liberty Mutual Group**
Nancy Adams
One Financial Center
Boston, MN 02111
nadams@mintz.com

**VIA US Mail**
**Church Mutual Insurance Company**
Christian A. Preus
33 South Sixth Street, Suite 3800
Minneapolis, MN 55402
cpreus@bassford.com

**VIA US Mail**
**Fireman's Fund Insurance Company**
Charles E. Jones
150 South Fifth Street
Suite 1200
Minneapolis, MN 55402
Charles.jones@lawmoss.com

Dated: December 19, 2016

/s/ Abigail M. McGibbon_____
Abigail M. McGibbon (#393263)
80 South 8th Street, STE 500
Minneapolis, MN 55402
Telephone: 612-632-3009
Fax: 612-632-4009
Abigail.mcgibbon@gpmlaw.com

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MINNESOTA

---

In re:

Diocese of Duluth,

      Debtor-in-Possession.

Bankruptcy Case No.:  15-50792

Chapter 11

---

Diocese of Duluth,

      Plaintiff,

v.

LIBERTY MUTUAL GROUP, a Massachusetts
Corporation; CATHOLIC MUTUAL RELIEF
SOCIETY OF AMERICA, a Nebraska
corporation; FIREMAN'S FUND
INSURANCE COMPANY, a California
corporation; CHURCH MUTUAL
INSURANCE COMPANY, a Wisconsin
corporation and THE CONTINENTAL
INSURANCE COMPANY, an Illinois
corporation,

      Defendants.

Adversary Proceeding No.: 16-05012

---

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT

---

      This case is before the Court on the motion of the Diocese of Duluth for summary

judgment.

      Based in the motion and file,

      IT IS ORDERED:

1.  The Diocese of Duluth's motion for partial summary judgment is granted; and

2.  That the legal standard for determining the number of occurrences corresponds to the

number of times a victim was abused limited to one such occurrence per-victim, per-

priest, per-policy year.


_____

United States Bankruptcy Judge