## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

---

In re:

Diocese of Duluth,

        Debtor-in-Possession.

Bankruptcy Case No. 15-50792

Chapter 11

---

Diocese of Duluth,
        Plaintiff,

v.

LIBERTY MUTUAL GROUP, a Massachusetts corporation; CATHOLIC MUTUAL RELIEF SOCIETY OF AMERICA, a Nebraska corporation; FIREMAN'S FUND INSURANCE COMPANY, a California corporation; CHURCH MUTUAL INSURANCE COMPANY, a Wisconsin corporation and THE CONTINENTAL INSURANCE COMPANY, an Illinois corporation,

        Defendants.

Adversary Proceeding No. 16-05012

---

## CATHOLIC MUTUAL RELIEF SOCIETY OF AMERICA'S RESPONSE
## TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## ON THE NUMBER OF OCCURRENCES

---

**SCHIFF HARDIN LLP**
David M. Spector, *pro hac vice*
Everett J. Cygal, *pro hac vice*
233 S. Wacker Drive, Suite 6600
Chicago, IL 60606
T: 312.258.5500
F: 312.258.5600
Email: dspector@schiffhardin.com
ecygal@schiffhardin.com

**BARNES & THORNBURG LLP**
Connie Lahn (Bar No. 0269219)
225 South Sixth Street
Suite 2800
Minneapolis, MN 55402-4662
T: 612.367.8706
F: 612.333.6798
Email: connie.lahn@btlaw.com

*Counsel for Catholic Mutual Relief Society of America*

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................ 1

Factual Background Regarding Catholic Mutual and Its Certificates ......................... 2

Argument ................................................................................................................... 5

I.     The Eighth Circuit's *Winona* Decision Is Binding Authority ........................... 5

     A.    *Winona* Held that Multi-Year Abuse of a Single Claimant Constitutes One Occurrence Per Policy Year ..................................................................... 5

     B.    Under the Reasoning of *Winona* and Minnesota Authorities, There Is One Occurrence Per Policy Year for Each Injured Claimant ........................ 7

     C.    *Winona* Remains Good Law ..................................................................... 10

II.    *Winona* Is Consistent With National Case Law ................................................. 11

     A.    Many Cases Hold that, Under a Policy like Catholic Mutual's, Multiple Acts of Abuse of One Claimant During One Policy Year Is One Occurrence ............................................................................................... 11

     B.    There Is No Basis for the Diocese's Suggestion that Each Act of Abuse Is a Separate Occurrence ........................................................................... 12

III.   The Diocese's Suggestion that Each Act of Abuse Constitutes a Separate Occurrence is Contrary to the Reasonable Expectation of the Parties ........................... 14

Conclusion ................................................................................................................ 16

Defendant Catholic Mutual Relief Society of America ("Catholic Mutual") hereby responds to the December 19, 2016 Motion for Partial Summary Judgment on the Number of Occurrences filed by the Diocese of Duluth ("Diocese") (DE 10-1).

## Introduction

Over time, multiple carriers, including Catholic Mutual, have contracted to provide the Diocese liability coverage for bodily injuries caused by covered "occurrences."[1] The present case involves underlying claims that the Diocese is liable for negligently supervising its agents, who sexually abused the claimants. The claimants allege abuse by various negligently supervised agents at various times over multiple years. How to count the number of occurrences is an important issue in this case because of the insurance policies' per-occurrence limits.[2]

The Diocese's motion for partial summary judgment argues that, for insurance purposes, one occurrence exists in each policy year for each claimant abused in that year by each abuser. Catholic Mutual agrees with this bottom-line conclusion, based on binding Eighth Circuit authority, *Winona v. Interstate Fire & Cas. Co*., 89 F.3d 1386 (8th Cir. 1996), construing policy language identical to that of Catholic Mutual's certificates. Catholic Mutual disagrees with how the Diocese reaches this conclusion, however, and files this Response to set forth the proper, straightforward analysis required by *Winona*, which is consistent with national case law.

The Court can resolve this issue as a matter of law, based on the plain terms of the policies and applicable judicial decisions construing these terms. Interpretation of insurance

---

[1] Catholic Mutual's liability coverage agreements are called "certificates" rather than "insurance policies," but function in the same way. The discussion below sometimes uses the terms "insurance" and "policies," with equal applicability to Catholic Mutual's certificates.

[2] The number-of-occurrences issue can sometimes be important for another reason. Under some policies, the policyholder is responsible for a per-occurrence self-insured retention ("SIR") before the insurer owes any coverage obligations. But the policies in the present case do not include an SIR.

contracts — like any other contract — is a question of law. *See, e.g., Thommes v. Milwaukee Ins. Co.,* 641 N.W.2d 877, 879 (Minn. 2002) ("The interpretation of an insurance policy is a question of law reviewed *de novo*.").

### Factual Background Regarding Catholic Mutual and Its Certificates

Catholic Mutual is a non-profit corporation organized and existing under the laws of the State of Nebraska, with its principal place of business in the State of Nebraska. Catholic Mutual was founded in 1889 as a non-profit religious corporation. It operates as a self-insurance fund of the Catholic Church in the United States and Canada, counting 111 of the 195 United States dioceses among its members. Its Board of Trustees consists of the bishops and archbishops of 23 dioceses across the United States. Catholic Mutual issues certificates of coverage to participating members, which provide the members with coverage for certain property and casualty risks.

Catholic Mutual issued such certificates to the Diocese for annual periods from April 1, 1982 to the present. Until April 1, 1990, these certificates were "occurrence" based; thereafter, the certificates were "claims-made" based.[3] Only the occurrence-based certificates, and not the claims-made certificates, are at issue in the Diocese's motion.[4]

---

[3] The Minnesota Supreme Court has described the difference between these two kinds of policies. "Under a claims-made policy, insurers do not cover claims submitted after the end of the policy period, even if the injury underlying the claim arose during the policy period. The claims-made policies include a retroactive date that defines the earliest date the injury can have occurred in order for the policy to cover the resulting claim. The most significant difference between occurrence-based and claims-made policies is that occurrence-based policies can be triggered after the expiration of the policy period, while claims-made policies cannot." *In re Silicone Implant Ins. Coverage Litig.*, 667 N.W.2d 405, 409-10 (Minn. 2003). *See also St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 535 n.3 (1978) ("An 'occurrence' policy protects the policyholder from liability for any act done while the policy is in effect, whereas a 'claims made' policy protects the holder only against claims made during the life of the policy.").

[4] The Diocese's motion seeks a ruling on the number of occurrences, which is an issue only under occurrence-based policies. Accordingly, its brief seeks a determination only regarding its occurrence-based coverage. *See* Diocese's brief (DE 10-1) at 1-2 (focusing on "policies with 'per occurrence' policy limits"); *id.* at 4 (addressing "harm that triggers an occurrence-based

-2-

From April 1, 1982 to April 1, 1985, Catholic Mutual provided occurrence-based liability coverage under Certificate No. 7071 (relevant portions of which are attached as Exhibit A, Bates-numbered with the prefix CM-DULUTH-R). The relevant terms of this Certificate, set forth below, are representative of those found in all of its occurrence-based certificates. This Certificate provides to the Diocese a layer of primary coverage and umbrella excess coverage. A $300,000 per-occurrence limit applies to the primary layer and a $10,000,000 limit applies to the excess. Ex. A at CM-DULUTH-R000001.

Key terms of this Certificate are as follows. Under the primary liability coverage, Catholic Mutual agreed to

> pay on behalf of [the Diocese] all sums which [the Diocese] shall become legally obligated to pay as damages because of bodily injury . . . to which this coverage applies, caused by an occurrence.

*Id.* at CM-DULUTH-R000039. The Certificate defines an "occurrence" as

> an accident, including continuous or repeated exposure to conditions, which result in bodily injury or property damage neither expected nor intended from the standpoint of [the Diocese]

*Id.* at CM-DULUTH-R000035.

The Certificate further defines the terms "accident" and "bodily injury." It specifies:

> This coverage applies only to accidents *which occur during the certificate period*.

*Id.* at CM-DULUTH-R000041 (emphasis added). And it defines "bodily injury" as

> bodily injury, sickness or disease sustained by any person *which occurs during the certificate period*, including death at any time resulting therefrom.

---

insurance policy"); *id.,* Exs. A-B (excerpts only of occurrence-based policies). Moreover, the limited sexual misconduct coverage that the claims-made policies provide is only for misconduct after specified retroactive dates, and almost all of the underlying claims against the Diocese allege such misconduct on earlier dates.

*Id.* at CM-DULUTH-R000035 (emphasis added). The Certificate also states:

> For the purpose of determining the limit of [Catholic Mutual's] liability, all bodily injury . . . arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

*Id.* at CM-DULUTH-R000040.

The language of the Certificate's umbrella-excess layer is substantially like the language of the primary layer. Specifically, in the umbrella-excess layer, Catholic Mutual agreed to

> indemnify the [Diocese] for all sums which the [Diocese] shall be legally obligated to pay as damages . . . on account of . . . Personal Injuries . . . to which this Certificate applies, caused by an occurrence.

*Id.* at CM-DULUTH-R000046. The Certificate defines an "occurrence" as

> an accident, including injurious exposure to conditions, which results, *during the certificate period*, in personal injury . . . neither expected nor intended from the standpoint of the [Diocese]."

*Id.* at CM-DULUTH-R000048 (emphasis added). The Certificate defines "personal injury" as

> bodily injury, mental injury, mental anguish, shock, sickness, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination, [or] humiliation; also libel, slander or defamation of character or invasion or rights of privacy.

*Id.* The Certificate states that the excess layer

> applies to personal injury . . . *which occurs . . . during the certificate period*.

*Id.* (emphasis added). The excess layer also states:

> For the purpose of determining the limit of [Catholic Mutual's] liability, all damages arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

*Id.* at CM-DULUTH-R000046.

## Argument

The underlying claims assert that the Diocese is liable for the claimants' injurious exposure to negligently supervised agents of the Diocese. There is no dispute that Catholic Mutual's occurrence-based coverage applies to such negligent supervision claims, if the injury is unexpected and unintended by the Diocese, because the Certificate promises that Catholic Mutual will cover the Diocese's obligation to pay damages for bodily injury caused by an "occurrence," defined in standard terms as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury . . . neither expected nor intended from the standpoint of the [Diocese]."[5] Catholic Mutual understands that the Diocese's other occurrence-based liability insurance policies have similar terms.[6]

The question is how many occurrences exist for purposes of the per-occurrence limits of each of the Diocese's occurrence-based policies. The Eighth Circuit provided binding Minnesota-law authority on this question in *Winona v. Interstate Fire & Cas. Co.*, 89 F.3d 1386 (8th Cir. 1996). *Winona* remains good law, and is consistent with national case law on this issue.

### I.   The Eighth Circuit's *Winona* Decision Is Binding Authority.

#### A.   *Winona* Held that Multi-Year Abuse of a Single Claimant Constitutes One Occurrence Per Policy Year.

*Winona* involved underlying claims that "a pedophilic priest . . . subjected numerous

---

[5] This is true for the 1982-1985 Certificate discussed in this response, as well as the 1985-1986 certificate. Beginning in 1986, Catholic Mutual's occurrence-based certificates specifically excluded coverage for sexual abuse, except for a $100,000 aggregate policy limit, including loss adjustment and defense costs.

[6] If the terms of the policies were different, they might not cover such negligent supervision claims. *See, e.g., Allstate Ins. Co. v. Steele,* 74 F.3d 878, 881 (8th Cir. 1996) (applying Minn. law) (policy's exclusion of damages "resulting from" intentional misconduct excluded coverage for claim of negligent supervision of sexual assailant); *Ill. Farmers Ins. Co. v. M.S.*, No. Civ. 04-3102RHKJSM, 2005 WL 741898, at *5 (D. Minn. Mar. 31, 2005) (same); *Amos v. Campbell*, 593 N.W.2d 263, 269 (Minn. Ct. App. 1999) (same).

children to prolonged periods of sexual molestation," but the case addressed the insurance

obligations relating to a single individual's claim. *Winona*, 89 F.3d at 1389. Applying Minnesota

law to construe liability policies with the same terms as Catholic Mutual's Certificate, the Eighth

Circuit held that negligent supervision of the priest, resulting in continuing abuse of the

individual over multiple years, triggered insurance coverage in each policy year. *Id.* at 1390 n.5.

The Eighth Circuit rejected one insurer's argument that "since there was only 'one continuous

occurrence,' it should be responsible for at most one insurance policy limit." *Id.* Instead, the

Eighth Circuit explained,

> [T]he occurrence is the continuous and repeated exposure of [the claimant] to the
> negligent supervision of [the abuser] . . . . [A] single, continuous occurrence
> spanning multiple policy periods constitutes *a single occurrence in each policy
> period*.

*Id.* (emphasis added). In reaching this conclusion, the Eighth Circuit drew a distinction between

the occurrence and the resulting injury that triggered the insurer's obligations:

> In understanding this analysis, it is important to separate the occurrence from the
> injury in fact. The occurrence results in the injury, but the events constituting the
> occurrence are distinct from the resulting injury. In the context of the present
> case, the occurrence is the continuous and repeated exposure of [the claimant] to
> the negligent supervision of [the abuser] by both the Diocese and the
> Archdiocese. The abuse is the actual injury, not the occurrence. Under Minnesota
> law, it is the time of the actual injury within the effective dates of the policy
> which triggers the policy. . . . In other words, the time of the occurrence
> producing the injury is irrelevant to the triggering of the policy.
>
> . . . . [Thus,] a single, continuous occurrence spanning multiple policy periods
> constitutes a single occurrence in each policy period.

*Id.* The bottom line, the Court held, is that in this kind of situation when there are "multiple

policies" over time, "the courts should apply one full . . . limit to each separate policy period."

*Id.* at 1396 n.11.

    *Winona*'s conclusion — that a claimant's injurious exposure to a negligently supervised

abuser constitutes one occurrence in each policy year in which abuse of the claimant took place

— is consistent with the applicable policy language here. Abuse constitutes "injury."[7] The

Catholic Mutual Certificate promises to pay for covered injury "which occurs *during the*

*certificate period.*" Ex. A, CM-DULUTH-R000035 (primary layer) (emphasis added); *id.* at CM-

DULUTH-R000048 (excess layer). And a series of acts of abuse (i.e., a series of injuries) during

the Certificate period is treated as arising from one occurrence. *Id.* at CM-DULUTH-R000040, -

46 ("continuous or repeated exposure" to such injurious conditions "shall be considered as

arising out of one occurrence").

> **B.    Under the Reasoning of *Winona* and Minnesota Authorities, There Is One Occurrence Per Policy Year for Each Injured Claimant.**

As noted above, *Winona* held that that "[t]he abuse is the actual injury," and "[u]nder

Minnesota law, it is the time of the actual injury within the effective dates of the policy which

triggers the policy." *Winona*, 89 F.3d at 1390 n.5. Under this reasoning, when there are multiple

claimants, each of whom has experienced injurious exposure to a negligently supervised abuser,

each claimant's injury triggers the insurer's obligation to "pay on behalf of [the Diocese what it

is] legally obligated to pay as damages because of bodily injury." That is, each claimant

---

[7] *See Winona,* 89 F.3d at 1390 n.5 ("[t]he abuse is the actual injury"). *See also Redeemer Covenant Church of Brooklyn Park v. Church Mut. Ins. Co.*, 567 N.W.2d 71, 81-82 (Minn. Ct. App. 1997) ("as a matter of law one is injured if one is sexually abused") (citing *Blackowiak v. Kemp,* 546 N.W.2d 1, 3 (Minn.1996) ("concepts of sexual abuse and injury . . . are essentially one and the same, not separable—as a matter of law one is 'injured' if one is sexually abused")). *See also, e.g., D.M.S. v. Barber,* 645 N.W.2d 383, 387 (Minn. 2002) (same); *W.J.L. v. Bugge*, 573 N.W.2d 677, 681 (Minn. 1998) (same).

The issue in *Blackowiak*, *D.M.S.*, and *W.J.L.* concerned commencement of the statute of limitation for asserting claims of sexual abuse, rather than the triggering date for an insurance policy. The tort statute of limitation may be tolled (e.g., until the claimant ceases to be a minor), but such tolling does not affect which insurance policy applies to the claim. *See City of Erie, Pa. v. Guar. Nat'l Ins. Co.,* 109 F.3d 156, 161 (3d Cir. 1997) (delayed commencement of the statute of limitation does not govern "when a tort occurs for insurance purposes") (collecting cases). The *Blackowiak*, *D.M.S.*, and *W.J.L.* cases show when the injury occurs (whether or not the statute of limitation is tolled), and the date of injury controls which insurance policies apply.

individually experienced injurious exposure to a negligently supervised abuser (an occurrence) and individually has an "actual injury" (the trigger for the insurer's obligation to "pay as damages because of bodily injury"). Thus, policy benefits apply claimant-by-claimant — that is, there is one occurrence for each claimant injured in a given policy year, rather than a single collective occurrence for all claimants. This conclusion is confirmed by *In re Silicone Implant Ins. Coverage Litig.,* 667 N.W.2d 405 (Minn. 2003). In that case, the policyholder faced multiple claims of injury related to silicone gel breast implants. The Minnesota Supreme Court upheld the factual conclusion that each claimant's injury took place upon implantation, and reached the legal conclusion that these injuries triggered only an insurance policy in effect at the time of implantation (not every policy in effect throughout the years when the implants were in place). *Id.* at 417. While only one policy year was triggered, it is clear that one policy year was triggered for *each* claimant.

The Diocese's brief correctly states that in *Winona* "the Eighth Circuit held that the repeated instances of abuse constituted one occurrence per policy period. *Id.* at 1390 n.5, 1396 n.11." *See* Diocese's brief (DE 10-1) at 8. Unfortunately, the Diocese errs in applying the rule recognized in *Winona* to the facts of this case. *Winona* involved a single predator abusing a single victim on multiple occasions over a multi-year period. Consistent with the language of the policy of insurance and the overwhelming weight of authority, the Eighth Circuit held that the "occurrence" was the injurious exposure of that single victim to the negligently supervised abuser during each policy period. Importantly, the facts in *Winona* did not involve — and thus the Court had no cause to consider — the number of occurrences if there were multiple victims. But the inescapable logic of *Winona* is that each victim's injurious exposure to a negligently supervised abuser would constitute a separate occurrence. The exposure of each victim during a

policy period would thus involve, to use the operative part of the policy definition of "occurrence," an "exposure to conditions" directly causing the injury.

It may be that the Diocese is confused by the reference in the last paragraph of footnote 5 in *Winona* to the decision in *Uniroyal, Inc. v. Home Ins. Co*., 707 F. Supp. 1368 (E.D.N.Y. 1988) ("*Agent Orange*"). In *Agent Orange*, Judge Weinstein found that injuries to multiple victims were caused by a single occurrence, while in the present case ("*Duluth*") both the Diocese and Catholic Mutual contend that injuries to multiple victims resulted from multiple occurrences. This is hardly a contradiction, however, when one considers that *Duluth* and *Winona* are sexual abuse/negligent supervision cases and *Agent Orange* is a products liability case. The exposure conditions characterizing a products case are quite different from a sexual abuse case. In *Agent Orange*, exposure to a chemical cloud caused multiple injuries while in *Winona* and *Duluth* the injury was caused by individual exposure to a negligently supervised abuser. It is hardly surprising that the number of occurrences would, in part, be a function of the fact that "exposure to conditions" constituting the accident differ widely from circumstance to circumstance.

That the nature of the conditions to which a victim is exposed could significantly affect the determination of the number of occurrences was specifically noted in *Northern States Power Co. v. Fidelity & Cas. Co*., 523 N.W.2d 657, 664 (Minn. 1994) ("*NSP*"), and the district court in *Winona* quoted this important observation at length:

> "Like the federal district court in one of the 'Agent Orange' cases, we have concluded that the discharge or escape of coal tar and oxide contaminates has been so continuous and repetitive that the unidentifiable individual instances have merged into one continuing occurrence. We hold, therefore, that there has been one occurrence during the period policy of each applicable St. Paul policy and NSP must assume the retained limit with respect to each of these policies."

*Diocese of Winona v. Interstate Fire & Casualty Co.*, 916 F. Supp. 923, 928 (D. Minn. 1995) (quoting *NSP*, 523 N.W.2d at 664), *aff'd, Winona v. Interstate Fire & Cas. Co*., 89 F.3d 1386

(8th Cir. 1996). *NSP* involved only a single contaminated site. *See NSP*, 916 F. Supp. at 664. The

inescapable logic of *NSP* is that had there been two contaminated sites, there would have been

two occurrences. Indeed, just as the *NSP* discharge of coal tar and oxide contaminates had been

so "continuous and repetitive that the unidentifiable individual instances have merged into one

continuing occurrence," so in the sexual abuse/negligent supervisions cases have the individual

acts of sexual abuse similarly merged into one continuing occurrence per policy year. But they

merge into one continuing occurrence for each individual victim. If there are two victims, the

molestation suffered by Victim A and that suffered by Victim B are separate, distinct, and

identifiable. Under the clear reasoning of *Winona* and *NSP*, the injurious exposure of each of

those victims to the negligently supervised abuser constitutes a separate occurrence.

### C.      *Winona* **Remains Good Law.**

*Winona* remains good law, despite the Diocese's suggestions to the contrary. *See*

Diocese's brief (DE 10-1) at 7-12. In part, the Diocese may have misapprehended *Winona*'s

holding. The Diocese suggests that *Winona* concluded that "finding multiple occurrences would

[improperly] require the insured to pay multiple SIRs." *Id.* at 12. But *Winona* recognized that the

insured Archdiocese properly owed "one SIR per policy period" for the injured claimant,

because the multi-year abuse of the claimant constituted one occurrence per policy year. 89 F.3d

at 1390 n.5. *See also id.* at 1396 n.11 (because "one full SIR [applies] to each separate policy

period, . . . the Archdiocese must assume the retained limit with respect to each of the triggered

policies").

The suggestion that *Winona* has been superseded by subsequent Minnesota case law is

also incorrect. A case *Winona* relied on, *NSP*, was not "rejected" by *In re Silicone Implant Ins.*

*Coverage Litig.,* 667 N.W.2d 405 (Minn. 2003), as the Diocese suggests in its brief at 9-10.

Rather,  *Silicone* repeatedly cited and reaffirmed *NSP.* 667 N.W.2d at 414-15, 417-20, 422. Nor

does the fact that *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305 (Minn. 1995) and *Silicone* required insurers to pay benefits under one policy year, rather than under multiple policy years, undermine *Winona*, as the Diocese suggests (DE-10-1 at 10-11). Only one policy year applied in those cases: *SCSC* involved a "single event" (a chemical spill), a single occurrence, and a single policy year, and *Silicone* also involved a single injurious event for each claimant (implantation of silicone gel breast implant with immediate injury). By contrast, *Winona* (like the present case) involved multiple injurious events over multiple policy years.

## II.     *Winona* Is Consistent With National Case Law.

### A.     Many Cases Hold that, Under a Policy like Catholic Mutual's, Multiple Acts of Abuse of One Claimant During One Policy Year Is One Occurrence.

*Winona* makes clear that when a diocese's negligently supervised agent commits multiple acts of abuse against a single claimant, such multiple acts of abuse during a policy year constitute one occurrence under an occurrence-based liability policy like Catholic Mutual's. Many courts across the country agree. *See, e.g.*:

● *Roman Catholic Diocese of Joliet, Inc. v. Interstate Fire Ins. Co.*, 685 N.E.2d 932, 938 (Ill. App. 1st Dist. 1997) (construing identical policy language in identical circumstances; "A plain reading [shows] that [it is not ] negligent supervision alone [but rather] the repeated 'exposure' of the minor to the negligently supervised priest that could constitute an occurrence . . . . in each of the policy periods").

● *Soc'y of Roman Catholic Church of Diocese of Lafayette & Lake Charles, Inc. v. Interstate Fire & Cas. Co.*, 26 F.3d 1359, 1365 (5th Cir. 1994) ("When a priest molested a child during a policy year, there was both bodily injury and an occurrence, triggering policy coverage. All further molestations of that child during the policy period arose out of the same occurrence. When the priest molested the same child during the succeeding policy year, again there was both

bodily injury and an occurrence. Thus, each child suffered an 'occurrence' in each policy period in which he was molested.").

● *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 150 F.3d 526, 532-33 (5th Cir. 1998) ("the sexual molestation of different children constitutes separate occurrences"; "When a priest molested a child during a policy year, there was both bodily injury and an occurrence, triggering policy coverage. All further molestation of that child during the policy period arose out of the same occurrence.").

● *Interstate Fire & Cas. Co. v. Archdiocese of Portland in Oregon,* 35 F.3d 1325, 1329 (9th Cir. 1994) ("[T]he occurrence is not the Archdiocese's negligent supervision of [the abuser] as such, but the "exposure" of the boy to the negligently supervised priest, and when this definition is inserted back into the assuring clause, it is clear that the policy covers only 'injuries arising out of [the exposure of the boy to the negligently supervised priest] happening during the period of insurance.'").

● *Kansas State Bank & Trust v. Midwest Mut. Ins. Co.,* 25 F.3d 1057 (Table), 1994 WL 192035, *2 (10th Cir. 1994) (multiple acts of misconduct by an abuser toward a claimant "during a policy period constitute a single occurrence").

**B.      There Is No Basis for the Diocese's Suggestion that Each Act of Abuse Is a Separate Occurrence.**

Despite this authority, the Diocese suggests that, absent a so-called "occurrence deemer" clause, each act of abuse within a single policy year would constitute a separate "occurrence." [8] The Diocese asserts:

> Under Minnesota law, each act of abuse constitutes a separate "occurrence." Thus, where there is more than one instance of abuse, there is more than one

---

[8] The Diocese makes this assertion even though Catholic Mutual's Certificate contains such a so-called "deemer" clause. *See* Ex. A at CM-DULUTH-R000040, -46.

occurrence. This means that a victim abused by the same priest more than once in
a single year would yield multiple occurrences in that year. This is a reasonable
approach recognized in other jurisdictions.

Diocese's brief (DE 10-1) at 6 (citing *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 991 N.E.2d 666, 675 n.6 (N.Y. 2013)). This is a misstatement both of Minnesota law and of the result in *Diocese of Brooklyn*.

It is certainly not true that "under Minnesota law, each act of abuse constitutes a separate "occurrence," as is evidenced by the fact that neither at this point nor at any other place in its brief does the Diocese cite any Minnesota case authority for this assertion. Indeed, the Eighth Circuit's language in *Winona*, 89 F.3d at 1390 n.5, is exactly the opposite:

> [I]t is important to separate the occurrence from the injury in fact. The occurrence results in the injury, but the events constituting the occurrence are distinct from the resulting injury. In the context of the present case, *the occurrence is the continuous and repeated exposure of [the claimant] to the negligent supervision of [the abuser].* The abuse is the actual injury, not the occurrence. Under Minnesota law, it is the time of the actual injury within the effective dates of the policy which triggers the policy. . . . In other words, the time of the occurrence producing the injury is irrelevant to the triggering of the policy. . . . [A] single, continuous occurrence spanning multiple policy periods constitutes a single occurrence in each policy period.

(Emphasis added.) Not only does the Diocese' assertion that "each act of abuse constitutes a separate occurrence" find no support in any reported Minnesota case, but it also finds very little support in the only non-Minnesota case cited by the Diocese, *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 991 N.E.2d 666 (N.Y. 2013).

There is no majority opinion in *Diocese of Brooklyn,* and it should be recognized upfront that the opinion of the plurality relating to number of occurrences is very unclear. As Judge Graffeo said in his partial concurrence/partial dissent, "the decision is somewhat unclear as to whether there were multiple occurrences per policy or whether it is aggregating abuse incidents within each policy year, resulting in one occurrence per policy." *Id.* at 680. What is clear is that

in a case involving a single victim of multiple acts of sexual abuse, the plurality of the New York

Court of Appeals allocated the damages across seven policy periods, with one limit and one self-

insured retention in each of the seven periods. *Id*. at 676. In other words, the result in *Diocese of*

*Brooklyn*, no matter how confusing the language of the plurality opinion, is consistent with the

overwhelming weight of authority on this subject. If *Diocese of Brooklyn* actually stood for the

proposition that each act of abuse was a separate occurrence, as the Diocese wrongly claims,

then the result in the case would have been that there were as many limits and retentions in each

period as there were acts of abuse. But this was not the result of the case. As Judge Graffeo said

in his partial concurrence/partial dissent,

> The bottom line is that, whether based on the policy language or some other
> analysis, most negligent hiring and supervision cases arising from repeated acts of
> child sexual abuse generally fall into one of two categories. In cases where the
> abuse did not span more than one policy period, courts have held that there was
> one occurrence per injured plaintiff . . . . In cases where the definition of
> occurrence included durationally-restrictive language and the abuse spanned more
> than one policy year, courts have concluded that there was one occurrence per
> injured plaintiff per policy year . . . .

*Diocese of Brooklyn*, 991 N.E.2d at 683-84 (Graffeo, J., concurring in part and dissenting in part)

(citations omitted).

## III.    The Diocese's Suggestion that Each Act of Abuse Constitutes a Separate Occurrence is Contrary to the Reasonable Expectation of the Parties.

The language in Catholic Mutual's certificates clearly and unambiguously means that

when a perpetrator commits multiple instances of abuse against a victim over multiple policy

periods, such conduct constitutes one occurrence per abuser per victim per policy period. As set

forth above, the Eighth Circuit in *Winona* and numerous other courts around the country reached

this same determination from language similar to that in Catholic Mutual's certificates, without

finding the language ambiguous. Further, the Diocese seems to agree that this is the plain

meaning of the language. Nevertheless, the Diocese argues (contrary to the plain language of the

certificates and this case law) that the term "occurrence" is ambiguous and should be construed

in favor of the Diocese. Diocese's brief (DE 10-1) at 17-19.

Even if the term "occurrence" were ambiguous, it would have to be construed to give

effect to the parties' intent — a construction that must honor the parties' objectively reasonable

expectations. The "reasonable expectations" doctrine has been part of Minnesota law since 1985.

*See Atwater Creamery Co. v. Western Nat'l Mut. Ins. Co.*, 366 N.W.2d 271 (Minn. 1985). As

*Atwater* explained:

> [T]he objectively reasonable expectations of applicants and intended beneficiaries
> regarding the terms of insurance contracts will be honored even though
> painstaking study of the policy provisions would have negated those expectations.

*Id*. at 277 (quoting Robert E. Keeton, *Insurance Law Rights at Variance with Policy Provisions*,

83 Harv. L. Rev. 961, 967 (1970)). The doctrine applies when terms of an insurance contract are

ambiguous. *See Carlson v. Allstate Ins. Co.,* 749 N.W.2d 41, 49 (Minn. 2008).

The reasonable expectations doctrine "require[s] that expectations of coverage by the

insured be reasonable under the circumstances." *Atwater*, 366 N.W.2d at 278. Here, the

Diocese's suggested construction — that, absent a so-called "occurrence deemer" clause, each

act of abuse within a single policy year constitutes a separate "occurrence" — is not objectively

reasonable because it is administratively unworkable and impractical. The underlying claims

typically assert that decades ago, when the claimants were children, the abuser committed

numerous instances of improper touching. Any attempt to precisely quantify how many touches

took place in any given policy period would be hopelessly impractical, unreliable, and

unrealistic. The nature of the acts, the claimants' youth, and the passage of time would make

accurate counting impossible. Moreover, in circumstances in which an insurance policy provides

for an SIR, a rule based on the number of touchings could easily result in the diocese having no

insurance coverage at all.

-15-

**Conclusion**

The policy terms and binding Eighth Circuit authority compel the conclusion that, for insurance purposes, one occurrence exists in each policy year for each claimant abused in that year by each abuser. This conclusion is reinforced by decisions in many other jurisdictions, by sound reasoning, and by the reasonable expectations of the parties. Catholic Mutual therefore requests that the Court construe its liability coverage certificates accordingly.

Dated: February 3, 2017                      Respectfully submitted,

                                             SCHIFF HARDIN LLP
                                             By: /e/ David M. Spector
                                             David M. Spector, *pro hac vice*
                                             Everett J. Cygal, *pro hac vice*
                                             233 S. Wacker Drive, Suite 6600
                                             Chicago, IL 60606
                                             T: 312.258.5500
                                             F: 312.258.5600
                                             Email: dspector@schiffhardin.com
                                             ecygal@schiffhardin.com

                                             and

                                             BARNES & THORNBURG LLP
                                             By: /e/ Connie A. Lahn
                                             Connie Lahn (Bar No. 0269219)
                                             225 South Sixth Street
                                             Suite 2800
                                             Minneapolis, MN 55402-4662
                                             T: 612.367.8706
                                             F: 612.333.6798
                                             Email: connie.lahn@btlaw.com

                                             *Counsel for Catholic Mutual Relief*
                                             *Society of America*

CH2\19213573.5

-16-

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

In re:

Diocese of Duluth,

        Debtor-in-Possession.

Bankruptcy Case No. 15-50792

Chapter 11

Diocese of Duluth,

        Plaintiff,

v.

LIBERTY MUTUAL GROUP, a Massachusetts
corporation; CATHOLIC MUTUAL RELIEF
SOCIETY OF AMERICA, a Nebraska
corporation; FIREMAN'S FUND
INSURANCE COMPANY, a California
corporation; CHURCH MUTUAL
INSURANCE COMPANY, a Wisconsin
corporation and THE CONTINENTAL
INSURANCE COMPANY, an Illinois
corporation,

        Defendants.

Adversary Proceeding No. 16-05012

## DECLARATION OF DAVID M. SPECTOR IN SUPPORT OF CATHOLIC MUTUAL'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE NUMBER OF OCCURRENCES

I, David M. Spector, declare under penalty of perjury that the following is true and

correct:

1.       I am a partner with Schiff Hardin LLP, counsel for Catholic Mutual Relief

Society of America ("Catholic Mutual"), a defendant in this adversary proceeding. I am

familiar with the facts and circumstances of this proceeding by virtue of my involvement

in this matter and review of the case files.  I believe that the information provided herein is true and correct to the best of my knowledge.  I submit this declaration in support of Catholic Mutual's Response to Plaintiff's Motion for Partial Summary Judgment on the Number of Occurrences.

2.        Attached here to as Exhibit A is a true and correct copy of the declarations page and certain forms from the certificate of insurance issued by Catholic Mutual to the Diocese of Duluth for the 1982-1985 certificate period, Bates-numbered with the prefix CM-DULUTH-R.  This certificate has previously been produced to the Diocese of Duluth, the plaintiff in this proceeding.


Dated: February 3, 2017

By: /e/ David M. Spector
    David M. Spector (admitted *pro hac vice*)

CH2\19243088.1\08:17

# EXHIBIT A

## Broad Protection for Catholic Church Properties

# THE CATHOLIC MUTUAL RELIEF SOCIETY
## OF AMERICA
### OMAHA, NEBRASKA

**SMP** 7071

In Consideration of the Stipulations and Charges Herein Named

Does Protect __Diocese of Duluth__

Address __Chancery Office__
__215 West 4th Street__
__Duluth, Minnesota__

Due at inception $ __69,792.00__

Due at each anniversary $ __69,792.00__

This Certificate covers from __April 1, 1982 to April 1, 1985__

Protection applies only to those Coverages for which a limit of liability is shown and this Society shall not be liable for more than the limit of liability specified for each Coverage at the following premises, used for Catholic Church and related purposes:

__Diocese of Duluth, Duluth, Minnesota__

### SECTION I—PHYSICAL DAMAGE TO AND LOSS OF USE OF PROPERTY

| Coverages | Limits of Liability | | | | |
|---|---|---|---|---|---|
| A | $ __57,557,500.00__ **Real Property** | D | $ See Form CMRS 149 | **Additional Expense** Blanket/Per Occurrence |
| B | $ __Included__ **Personal Property** | E | $ | **Burglary** |
| | | F | $ __25,000.00__ | Actual Cash Value-Plate Glass |
| C | $ __Nil__ **Loss of Income** | G | $ __5,000.00__ | **Pers. Prop. Floater** |
| | | H | $ 25,000.00 | **Employee Fidelity Bond** Blanket/Per Occur. |

Deductible Clause No. __See Form CMRS 149__ ..........shall apply to Section I.

I. Replacement Cost-Stained Glass & Fine
The Deductible Clause shall not apply to Coverage __E, F & H__
Arts Blanket/Per Occurrence

__None__ % Coinsurance Clause applies to Coverages A and B.

Mortgagee: __See Attached Endorsement__

### SECTION II—LIABILITY

| Coverage | Limit of Liability | |
|---|---|---|
| G | $ __300,000.00__ | Personal Injury and Property Damage Liability combined, each occurrence or accident. |
| H | $ __5,000.00__ | Medical Payments Each Person |
| J | $ __10,000.00__ | Medical Payments Each Accident |
| | 10,000,000.00 | **Umbrella Excess Liability** |

Dated at __Omaha, Nebraska__ this __1st__ day of __April 1982__

**CATHOLIC MUTUAL RELIEF SOCIETY OF AMERICA**

By _____

Authorized Representative

CMRS-11 1/77

# CATHOLIC MUTUAL RELIEF SOCIETY

## CERTIFICATE CONDITIONS AND DEFINITIONS
### GENERAL CONDITIONS

The following Conditions apply to Section I and II except as otherwise indicated. Additional Conditions or modifications of the following Conditions may appear in the specific coverage sections.

**1. Charges.** All charges for this certificate shall be computed in accordance with the Society's rules, rates, rating plans, charges and minimum charges applicable to the coverage afforded herein.

If this certificate is issued for a period in excess of one year with a specified expiration date and a charge is payable at each anniversary, such charge shall be determined annually on the basis of the rates in effect at the anniversary date.

If this certificate is issued for a period without a specified expiration date, it may be continued by payment of the required charge for the succeeding annual period. Such charge must be paid to the Society prior to each anniversary date; if not so paid, this certificate shall expire on the first anniversary date that the said charge has not been recieved by the Society.

**2. Time of Inception.** To the extent that coverage in this certificate replaces coverage in other policies, terminating noon standard time on the inception date of this certificate, coverage under this certificate shall not become effective until such other coverage has terminated.

**3. Cancellation.** This certificate may be cancelled by the Named Assured by surrender thereof to the Society or any of its authorized agents or by mailing to the Society written notice stating when thereafter the cancellation shall be effective. This certificate may be cancelled by the Society by mailing to the Named Assured at the mailing address shown in the Declarations, written notice stating when not less than ten days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the certificate period. Delivery of such written notice either by the Named Assured or by the Society shall be equivalent to mailing.

If the Named Assured cancels, the Society shall, upon demand and surrender of this certificate, refund the excess of paid charges above the customary short rates for the expired time. If the Society cancels, earned charges shall be computed pro rata. Charge adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned charges is not a condition of cancellation.

Notice of cancellation addressed to the Named Assured and mailed to the mailing address shown in the Declarations shall be sufficient notice to effect cancellation of this certificate.

**4. Concealment or Fraud.** This certificate is void if any Assured has intentionally concealed or misrepresented any material fact or circumstance relating to this coverage.

**5. Subrogation.**

(a) In the event of any payment under this certificate, the Society shall be subrogated to all the Assured's rights of recovery against any person or organization and the Assured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Assured shall do nothing after loss to prejudice such rights.

(b) The Society shall not be bound to pay any loss if the Assured has impaired any right of recovery for loss; however, it is agreed that the Assured may:

(1) as respects property while on the premises of the Assured, release others in writing from liability for loss prior to loss, and such release shall not affect the right of the Assured to recover hereunder, and

(2) as respects property in transit, accept such bills of lading, receipts or contracts of transportation as are ordinarily issued by carriers containing a limitation as to the value of such goods or merchandise.

**6. Inspection and Audit.** The Society shall be permitted but not obligated to inspect the Named Assured's property and operations at any time. Neither the Society's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking on behalf of or for the benefit of the Named Assured or others to determine or warrant that such property or operations are safe or healthful or are in compliance with any law, rule or regulation.

The Society may examine and audit the Named Assured's books and records at any time during the certificate period and extensions and within three years after the final termination of this certificate, as far as they relate to the subject matter of this coverage.

**7. Insurance Under More Than One Coverage, Part or Endorsement.** In the event that more than one coverage, part or endorsement of this certificate covers the same loss, damage or claim, the Society shall not be liable for more than the actual loss or damage sustained by the Assured.

**8. Waiver or Change of Provisions.** The terms of this coverage shall not be waived, changed or modified except by endorsement issued to form a part of this certificate.

CM-DULUTH-R000030

## CONDITIONS APPLICABLE TO SECTION I

**1. Certificate Period, Territory.** Section I of this certificate applies only to loss to property during the certificate period while such property is within or between the fifty states of the United States of America, the District of Columbia and Puerto Rico.

**2. Deductible.** Unless otherwise provided in the Declarations:

(a) The sum of $100 shall be deducted from the amount of loss to property in any one occurrence. This deductible shall apply:

(1) separately to each building, including personal property therein;

(2) separately to personal property in each building if no coverage is provided on the containing building; and

(3) separately to personal property in the open (including within vehicles).

**3. Removal.** This certificate covers loss by removal of the property covered hereunder from premises endangered by the named perils, and the amount of coverage applies pro rata for five days at each proper place to which such property shall necessarily be removed for preservation.

**4. Debris Removal.** This certificate covers expense incurred in the removal of debris of the property covered which may be occasioned by loss by any of the named perils in this certificate. The total amount recoverable under this certificate for both loss to property and debris removal expense shall not exceed the limit of liability applying to the property. Cost of removal of debris shall not be considered in the determination of actual cash value when applying the Coinsurance Clause.

**5. War Risk And Governmental Action Exclusion.** This certificate under Section I shall not apply to loss caused, directly or indirectly, by or due to any act or condition incident to the following:

(a) hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack (i) by any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces; or (ii) by military, naval or air forces; or (iii) by an agent of any such government, power, authority or forces, it being understood that any discharge, explosion or use of any weapon of war employing nuclear fission or fusion shall be conclusively presumed to be such a hostile or warlike action by such a government, power, authority or forces;

(b) insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence; seizure or destruction under quarantine or custom's regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transportation or trade.

**6. Nuclear Clause And Nuclear Exclusion.**

(a) Nuclear-Clause (Not Applicable in New York). The word ''fire'' in this certificate is not intended to and does not embrace nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and loss by nuclear reaction or nuclear radiation or radioactive contamination is not intended to be and is not covered by this certificate, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by ''fire'' or any other named perils covered by this certificate. However, subject to the foregoing and all provisions of this certificate, direct loss by ''fire'' resulting from nuclear reaction or nuclear radiation or radioactive contamination is covered by this certificate.

(b) Nuclear Clause (Applicable only in New York): This certificate does not cover loss or damage caused by nuclear reaction or nuclear radiation or radioactive contamination, all whether directly or indirectly resulting from a named peril covered under this certificate.

(c) Nuclear Exclusion (Not Applicable in New York): Loss by nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, or due to any act or condition incident to any of the foregoing is not covered by this certificate, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by any of the named perils covered by this certificate; and nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, is not ''explosion'' or ''smoke''. This clause applies to all named perils hereunder except the peril of fire, which is otherwise provided for in the nuclear clause above.

**7. Other Insurance.**

(a) If at the time of loss there is other insurance written in the name of the Assured upon the same plan, terms, conditions and provisions as contained in this certificate, herein referred to as Contributing Insurance, the Society shall be liable for no greater proportion of any loss than the limit of liability under this Certificate bears to the whole amount of insurance covering such loss.

(b) If at the time of loss there is other insurance other than that as described in (a) above, the Society shall not be liable for any loss hereunder until:

(1) the Liability of such other insurance has been exhausted, and

(2) then for only such amount as may exceed the amount due from such other insurance, whether collectible or not.

**8. Duties Of The Named Assured After A Loss.** In case of loss the Named Assured shall:

(a) give immediate written notice of such loss to the Society;

(b) protect the building and personal property from further damage, make reasonable temporary repairs required to protect the property, and keep an accurate record of repair expenditures;

(c) prepare an inventory of damaged personal property showing in detail, quantity, description, actual cash value and amount of loss. Attach to the inventory all bills, receipts and related documents that substantiate the figures in the inventory;

(d) exhibit the remains of the damaged property as often as may be reasonably required by the Society and submit to examination under oath;

(e) submit to the Society within 60 days after requested a signed, sworn statement of loss that sets forth to the best of the Named Assured's knowledge and belief:

(1) the time and cause of loss;

(2) interest of the Assured and all others in the property involved and all encumbrances on the property;

(3) other policies of insurance that may cover the loss;

(4) changes in title or occupancy of the property during the term of the certificate;

(5) specifications of any damaged building and detailed estimates for repair of the damage;

(6) an inventory of damaged personal property described in (c) above;

(f) give notice of such loss to the proper police authority if loss is due to a violation of law.

**9. Appraisal.** If the Named Assured and the Society fail to agree on the amount of the loss, either can demand that the amount of loss be set by appraisal. If either party makes a written demand for appraisal, each shall select a competent independent appraiser. Each shall notify the other of the selected appraiser's identity within twenty (20) days of the receipt of the written demand.

The two appraisers shall select a competent, impartial umpire. If the appraisers are unable to agree upon an umpire within fifteen (15) days, the Named Assured or the Society may petition a judge of a Court of Record in the state where the Assured premises is located to select an umpire.

The appraisers shall then set the amount of the loss. If the appraisers submit a written report of an agreement to the Society, the amount agreed upon shall be the amount of the loss. If the appraisers fail to agree within a reasonable time, they shall submit their differences to the umpire. Written agreement signed by any two of these three shall set the amount of loss.

Each appraiser shall be paid by the party selecting that appraiser. Other expenses of the appraisal and compensation of the umpire shall be paid equally by the Named Assured and the Society.

**10. Abandonment of Property.** The Society need not accept any property abandoned by an Assured.

**11. Privilege to Adjust With Owner.**

(a) Except as provided in (b) below, or unless another payee is specifically named in the certificate, loss, if any, shall be adjusted with and payable to the Named Assured.

CM-DULUTH-R000031

(b) In the event claim is made for damage to property of others held by the Assured, the right to adjust such loss or damage with the owner or owners of the property is reserved to the Society and the receipt of payment by such owner or owners in satisfaction thereof shall be in full satisfaction of any claim of the Assured for which such payment has been made.

If legal proceedings be taken to enforce a claim against the Assured as respects any such loss or damage, the Society reserves the right at its option without expense to the Assured to conduct and control the defense on behalf of and in the name of the Assured. No action of the Society in such regard shall increase the liability of the Society under this certificate, nor increase the limits of liability specified in the certificate.

**12. Suit.** No suit shall be brought on this certificate unless the Assured has complied with all the certificate provisions and has commenced the suit within one year after the loss occurs.

**13. Permits and Use.** Except as otherwise provided, permission is granted:

(a) to make alterations and repairs;

(b) in the event of loss hereunder, to make reasonable repairs, temporary or permanent, provided such repairs are confined solely to the protection of the property from further damage, and provided further that the Assured shall keep an accurate record of such repair expenditures. The cost of any such repairs directly attributable to damage by the named peril shall be included in determining the amount of loss hereunder. Nothing herein contained is intended to modify the certificate requirements applicable in case loss occurs, and in particular the requirement that, in case loss occurs, the Assured shall protect the property from further damage.

**14. Vacancy, Unoccupancy and Increase of Hazard.**

(a) This Society shall not be liable for loss occurring while a described building, whether intended for occupancy by owner or tenant is vacant beyond a period of sixty consecutive days. "Vacant" or "Vacancy" means containing no contents pertaining to operations or activities customary to occupancy of the building, but a building in process of construction shall not be deemed vacant.

(b) Permission is granted for unoccupancy.

(c) Unless otherwise provided in writing added hereto this Society shall not be liable for loss occurring while the hazard is increased by any means within the control or knowledge of the Assured.

**15. Protective Safeguards.** It is a condition of this coverage that the Assured shall maintain so far as is within his control such protective safeguards as are set forth by endorsement hereto.

Failure to maintain such protective safeguards shall suspend this coverage only as respects the location or situation affected for the time of such discontinuance.

**16. Mortgage Clause—Applicable Only to Buildings.** This clause is effective if a mortgage is named in the Declarations. The word "mortgagee" includes "trustee". Loss to buildings shall be payable to the named mortgagee as interest may appear, under all present or future mortgages on the buildings described in the Declarations in order of precedence of mortgages on them.

As it applies to the interest of any mortgagee designated in the Declarations, this coverage shall not be affected by any of the following:

(a) any act or neglect of the mortgagor or owner of the described buildings;

(b) any foreclosure or other proceedings or notice of sale relating to the property;

(c) any change in the title or ownership of the property;

(d) occupancy of the premises for purposes more hazardous than are permitted by this policy;

provided, that in case the mortgagor or owner shall neglect to pay any charge due under this certificate, the mortgagee shall, on demand, pay the charge.

The mortgagee shall notify the Society of any change of ownership or occupancy or increase of hazard which shall come to the knowledge of the mortgagee. Unless permitted by this certificate, such change of ownership or occupancy or increase of hazard shall be noted on the certificate and the mortgagee shall on demand pay the charge for the increased hazard for the term it existed under this certificate. If such charge is not paid, this certificate shall be null and void.

The Society reserves the right to cancel this certificate at any time as provided by its terms. If so cancelled, this certificate shall continue in force for the benefit only of the mortgagee for ten days after notice to the mortgagee of such cancellation and shall then cease. The Society shall have the right to cancel this agreement on ten days notice to the mortgagee.

When the Society shall pay the mortgagee any sum for loss under this certificate, and shall claim that as to the mortgagor or owner, no liability therefor existed, the Society shall, to the extent of such payment, be thereupon legally subrogated to all the rights of the mortgagee to whom such payment shall have been made, under the mortgage debt. In lieu of taking such subrogation, the Society may, at its option, pay to the mortgagee the whole principal due or to grow due on the mortgage, with interest accrued and shall thereupon receive a full assignment and transfer of the mortgage and of all such other securities. However, no subrogation shall impair the right of the mortgagee to recover the full amount of said mortgagee's claim.

**17. Recoveries.** In the event the Society has made payment for loss under the certificate and a subsequent recovery is made of the lost or damaged property, the Assured shall be entitled to all recoveries in excess of the amount paid by the Society, less only the actual cost of effecting such recoveries.

**18. Loss Clause.** Any loss hereunder shall not reduce the amount of this coverage.

**19. No Benefit To Bailee.** This coverage shall not inure directly or indirectly to the benefit of any carrier or other bailee.

**20. No Control.** This coverage shall not be prejudiced:

(a) by any act or neglect of the owner of any building if the Assured is not the owner thereof, or by any act or neglect of any occupant (other than the Assured) of any building when such act or neglect of the owner or occupant is not within the control of the Assured, or

(b) by failure of the Assured to comply with any warranty or condition contained in any endorsement attached to this certificate with regard to any portion of the premises over which the Assured has no control.

## CONDITIONS APPLICABLE TO SECTION II

**1. Supplementary Payments.** The Society will pay, in addition to the applicable limit of liability:

(a) all expenses incurred by the Society, all costs taxed against the Assured in any suit defended by the Society and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the Society has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the Society's liability thereon;

(b) charges on appeal bonds required in any such suit, charges on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this certificate, and the cost of bail bonds required of the Assured because of accident or traffic law violation arising out of the use of any vehicle to which this certificate applies, not to exceed $250 per bail bond, but the Society shall have no obligation to apply for or furnish any such bonds;

(c) expenses incurred by the Assured for first aid to others at the time of an accident, for bodily injury to which this certificate applies;

(d) reasonable expenses incurred by the Assured at the Society's request in assisting the Society in the investigation or defense of any claim or suit, including actual loss of earnings not to exceed $25 per day.

**2. Charges.** A Charge designated in this certificate as "advance charge" is a deposit charge only which shall be credited to the amount of the earned charge due at the end of the certificate period. At the close of each period (or part thereof terminating with the end of the certificate period) designated in the Declarations as the audit period the earned charge shall be computed for such period and, upon notice thereof to the Named Assured shall become due and payable. If the total earned charge for the certificate period is less than the charge previously paid, the Society shall return to the Named Assured the unearned portion paid by the Named Assured.

The Named Assured shall maintain records of such information as is necessary for charge computation and shall send copies of such records to the Society at the end of the certificate period and at such times during the certificate period as the Society may direct.

**3. Financial Responsibility Laws.** When this certificate is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such coverage as is afforded by this certificate for bodily injury liability or for property damage liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law. The Assured agrees to reimburse the Society for any payment made by the Society which it would not have been obligated to make under the terms of this certificate except for the agreement contained in this paragraph.

**4. Assured's Duties in the Event of Occurrence, Claim or Suit.**

(a) In the event of an occurrence, written notice containing particulars sufficient to identify the Assured and also reasonably obtainable information with respect to the time, place and circumstances thereof and the names and addresses of the injured and of available witnesses shall be given by or for the Assured to the Society or any of its authorized agents as soon as practicable.

(b) If claim is made or suit is brought against the Assured, the Assured shall immediately forward to the Society every demand, notice, summons or other process received by him or his representative.

(c) The Assured shall cooperate with the Society and, upon the Society's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Assured because of injury or damage with respect to which coverage is afforded under this certificate; and the Assured shall attend hearings and trails and assist in securing and giving evidence and obtaining the attendance of witnesses. The Assured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

**5. Medical Reports; Proof and Payment of Claim.** As soon as practicable the injured person or someone on his behalf shall give to the Society written proof of claim, under oath if requied, and shall, after each request from the Society, execute authorization to enable the Society to obtain medical reports and copies of records. The injured person shall submit to physical examination by physicians selected by the Society when and as often as the Society may reasonably require. The Society may pay the injured person or any person or organization rendering the services and the payment shall reduce the amount payable hereunder for such injury. Payment hereunder shall not constitute an admission of liability of any person or, except hereunder, of the Society.

**6. Action Against Society.** No action shall lie against the Society unless, as a condition precedent thereto, there shall have been full Compliance with all of the terms of this certificate, not until the amount of the Assured's obligation to pay shall have been finally determined either by judgment against the Assured after actual trial or by written agreement of the Assured, the claimant and the Society.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this certificate to the extent of the coverage afforded by this certificate. No person or organization shall have any right under this certificate to join the Society as a party in any action against the Assured to determine the Assured's liability, nor shall the Society be impleaded by the Assured or his legal representative. Bankruptcy or insolvency of the Assured or of the Assured's estate shall not relieve the Society of any of its obligations hereunder.

**7. Other Insurance.** The coverage afforded by this certificate is primary coverage, except when stated to apply in excess of or contingent upon the absence of other insurance. When this coverage is primary and the Assured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the Society's liability under this certificate shall not be reduced by the existence of such other insurance.

When both this coverage and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the Society shall not be liable under this certificate for a greater proportion of the loss than that stated in the applicable contribution provision below:

(a) **Contribution by Equal Shares.** If all of such other valid and collectible insurance provides for contribution by equal shares, the Society shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

(b) **Contribution by Limits.** If any of such other insurance does not provide for contribution by equal shares, the Society shall not be liable for a greater proportion of such loss than the applicable limit of liability under this certificate for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

**8. Annual Aggregate.** If this certificate is issued for a period in excess of one year, any limit of the Society's liability stated in this certificate as "aggregate" shall apply separately to each consecutive annual period.

**9. Nuclear Exclusion.**

I. This policy does not apply:

(a) Under any Liability Coverage, to bodily injury or property damage

(1) with respect to which an Assured under this certificate is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) resulting from the hazardous properties of nuclear material and with respect to which (i) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (ii) the Assured is, or had this certificate not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

CM-DULUTH-R000033

(b) Under any Medical Payments Coverage, or ( , any Supplementary Payments provision relating to first aid, to expense incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

(c) Under any Liability Coverage, to bodily injury or property damage resulting from the hazardous properties of nuclear material, if

  (1) the nuclear material (i) is at any nuclear facility owned by or operated by or on behalf of, an Assured or (ii) has been discharged or dispersed therefrom;

  (2) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an Assured; or

  (3) the bodily injury or property damage arises out of the furnishing by an Assured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to property damage to such nuclear facility and any property thereat.

II. As used in this exclusion

  "Hazardous properties" include radioactive, toxic or explosive properties;

  "nuclear material" means source material, special nuclear material or byproduct material;

  "source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means

  (a) any nuclear reactor,

  (b) any equipment or device designated or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

  (c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Assured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

  (d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"property damage" includes all forms of radioactive contamination of property.

CM-DULUTH-R000034

## DEFINITIONS APPLICABLE TO SECTION II

When used in the provisions applicable to Section II of this certificate (including endorsements forming a part hereof):

"**automobile**" means a land motor vehicle, trailer or semitrailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include **mobile equipment**;

"**bodily injury**" means bodily injury, sickness or disease sustained by any person which occurs during the certificate period, including death at any time resulting therefrom;

"**collapse hazard**" includes "structural property damage" as defined herein and **property damage** to any other property at any time resulting therefrom. "Structural property damage" means the collapse of or structural injury to any building or structure due to (1) grading of land, excavating, borrowing, filling, back-filling, tunneling, pile driving, cofferdam work or caisson work, or (2) moving, shoring, underpinning, raising or demolition of any building or structure or removal or rebuilding of any structural support thereof. The **collapse hazard** does not include **property damage** (1) arising out of operations performed for the Named Assured by independent contractors, or (2) included within the **completed operations hazard** or the **underground property damage hazard**, or (3) for which liability is assumed by the **Assured** under an **incidental contract**;

"**completed operations hazard**" includes **bodily injury** and **property damage** arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the **bodily injury** or **property damage** occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the Named Assured. "**Operations**" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

(1) when all operations to be performed by or on behalf of the Named Assured under the contract have been completed,

(2) when all operations to be performed by or on behalf of the Named Assured at the site of the operations have been completed, or

(3) when that portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The **completed operations hazard** does not include **bodily injury** or **property damage** arising out of

(a) operations in connection with the transportation of property, unless the **bodily injury** or **property damage** arises out of a condition in or on a vehicle created by the loading or unloading thereof,

(b) the existence of tools, uninstalled equipment or abandoned or unused materials, or

(c) operations for which the classification stated in the certificate or in the Society's manual specifies "including completed operations";

"**elevator**" means any hoisting or lowering device to connect floors or landings, whether or not in service, and all appliances thereof including any car, platform, shaft, hoistway, stairway, runway, power equipment and machinery; but does not include an **automobile** servicing hoist, or a hoist without a platform outside a building if without mechanical power or if not attached to building walls, or a hod or material hoist used in alteration, construction or demolition operations, or an inclined conveyor used exclusively for carrying property or a dumbwaiter used exclusively for carrying property and having a compartment height not exceeding four feet;

"**explosion hazard**" includes **property damage** arising out of blasting or explosion. The **explosion hazard** does not include **property damage** (1) arising out of the explosion of air or steam vessels, piping under pressure, prime movers, machinery or power transmitting equipment, or (2) arising out of operations performed for the Named Assured by independent contractors, or (3) included within the **completed operations hazard** or the **underground property damage hazard**, or (4) for which liability is assumed by the **Assured** under an **incidental contract**;

"**incidental contract**" means any written (1) lease of premises, (2) easement agreement, except in connection with construction or demolition operations on or adjacent to a railroad, (3) undertaking to indemnify a municipality required by municipal ordinance, except in connection with work for the municipality, (4) sidetrack agreement, or (5) **elevator** maintenance agreement;

"**Assured**" means any person or organization qualifying as an Assured in the "Persons Assured" provision of the applicable coverage. The coverage afforded applies separately to each Assured against whom claim is made or suit is brought, except with respect to the limits of the Society's liability;

"**mobile equipment**" means a land vehicle (including any machinery or apparatus attached thereto), whether or not self-propelled, (1) not subject to motor vehicle registration, or (2) maintained for use exclusively on premises owned by or rented to the Named Assured, including the ways immediately adjoining, or (3) designated for use principally off public roads, or (4) designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or permanently attached to such vehicle: power cranes, shovels, loaders, diggers and drills; concrete mixers (other than the mix-in-transit types); graders, scrapers, rollers and other road construction or repair equipment; air-compressors, pumps and generators, including spraying, welding and building cleaning equipment; and geophysical exploration and well servicing equipment.

"**Named Assured**" means the person or organization named in Item 1 of the declarations of this certificate;

"**Named Assured's products**" means goods or products manufactured, sold, handled or distributed by the Named Assured or by others trading under his name, including any container thereof (other than a vehicle), but "**Named Assured's products**" shall not include a vending machine or any property other than such container, rented to or located for use of others but not sold;

"**occurrence**" means an accident, including continuous or repeated exposure to conditions, which result in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the Assured;

"**certificate territory**" means:

(1) the United States of America, its territories or possessions, or Canada, or

(2) international waters or air space, provided the **bodily injury** or **property damage** does not occur in the course of travel or transportation to or from any other country, state or nation, or

(3) anywhere in the world with respect to damages because of **bodily injury** or **property damage** arising out of a product which was sold for use or consumption within the territory described in paragraph (1) above, provided the original suit for such damages is brought within such territory;

"**products hazard**" includes **bodily injury** and **property damage** arising out of the **Named Assured's products** or reliance upon a representation or warranty made at any time with respect thereto, but only if the **bodily injury** or **property damage** occurs away from premises owned by or rented to the Named Assured and after physical possession of such products has been relinquished to others;

"**property damage**" means (1) physical injury to or destruction of tangible property which occurs during the certificate period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** during the certificate period;

"**underground property damage hazard**" includes underground property damage as defined herein and **property damage** to any other property at any time resulting therefrom. "Underground property damage" means **property damage** to wires, conduits, pipes, mains, sewers, tanks, tunnels, any similar property, and any apparatus in connection therewith, beneath the surface of the ground or water, caused by and occurring during the use of mechanical equipment for the purpose of grading land, paving, excavating, drilling, borrowing, filling, back-filling or pile driving. The **underground property damage hazard** does not include **property damage** (1) arising out of operations performed for the Named Assured by independent contractors, or (2) included within the **completed operations hazard**, or (3) for which liability is assumed by the Assured under an **incidental contract**.

CM-DULUTH-R000035

# CATHOLIC MUTUAL RELIEF SOCIETY

## LIABILITY COVERAGE

**BODILY INJURY LIABILITY**

**PROPERTY DAMAGE LIABILITY**

I. The Society will pay on behalf of the **assured** all sums which the **assured** shall become legally obligated to pay as damages because of

**bodily injury** or

**property damage**

to which this coverage applies, caused by an **occurrence**, and arising out of the ownership, maintenance or use of the **covered premises** and all operations necessary or incidental to the business of the **named assured** conducted at or from the **covered premises**, and the Society shall have the right and duty to defend any suit against the **assured** seeking damages on account of such **bodily injury** or **property damage**, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Society shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Society's liability has been exhausted by payment of judgments or settlements.

**Exclusions**

This coverage does not apply:

(a) to liability assumed by the **assured** under any contract or agreement except an **incidental contract**; but this exclusion does not apply to a warranty of fitness or quality of the **named assured's products** or a warranty that work performed by or on behalf of the **named assured** will be done in a workmanlike manner;

(b) to **bodily injury** or **property damage** arising out of the ownership, maintenance, operation, use, loading or unloading of

(1) any **automobile** or aircraft owned or operated by or rented or loaned to any **assured**, or

(2) any other **automobile** or aircraft operated by any person in the course of his employment by any **assured**;

but this exclusion does not apply to the parking of an **automobile** on **covered premises**, if such **automobile** is not owned by or rented or loaned to any **assured**;

(c) to **bodily injury** or **property damage** arising out of (1) the ownership, maintenance, operation, use, loading or unloading of any **mobile equipment** while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for any such contest or activity or (2) the operation or use of any snowmobile or trailer designed for use therewith;

(d) to **bodily injury** or **property damage** arising out of and in the course of the transportation of **mobile equipment** by an **automobile** owned or operated by or rented or loaned to any **assured**;

(e) to **bodily injury** or **property damage** arising out of the ownership, maintenance, operation, use, loading or unloading of

(1) any watercraft owned or operated by or rented or loaned to any **assured**, or

(2) any other watercraft operated by any person in the course of his employment by any **assured**;

but this exclusion does not apply to watercraft while ashore on premises owned by, rented to or controlled by the **named assured**;

(f) to **bodily injury** or **property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or other water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

(g) to **bodily injury** or **property damage** arising out of operations on or from premises (other than **covered premises**) owned by, rented to or controlled by the **named assured**, or to liability assumed by the **assured** under any contract or agreement relating to such premises;

(h) to **bodily injury** or **property damage** for which the **assured** or his indemnitee may be held liable

(1) as a person or organization engaged in the business of manufac-

turing, distributing, selling or serving alcoholic beverages, or

(2) if not so engaged, as an owner or lessor of premises used for such purposes, if such liability is imposed

(i) by, or because of the violation of, any statute, ordinance or regulation pertaining to the sale, gift, distribution or use of any alcoholic beverage, or

(ii) by reason of the selling, serving or giving of any alcoholic beverage to a minor or to a person under the influence of alcohol or which causes or contributes to the intoxication of any person;

but part (ii) of this exclusion does not apply with respect to liability of the **assured** or his indemnitee as an owner or lessor described in (2) above.

(i) to any obligation for which the **assured** or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(j) to **bodily injury** to any employee of the **assured** arising out of and in the course of his employment by the **assured** or to any obligation of the **assured** to indemnify another because of damages arising out of such injury; but this exclusion does not apply to liability assumed by the **assured** under an **incidental contract**;

(k) to **property damage** to

(1) property owned or occupied by or rented to the **assured**,

(2) property used by the **assured**, or

(3) property in the care, custody or control of the **assured** or as to which the **assured** is for any purpose exercising physical control;

but parts (2) and (3) of this exclusion do not apply with respect to liability under a written sidetrack agreement and part (3) of this exclusion does not apply with respect to **property damage** (other than to elevators) arising out of the use of an **elevator** at premises owned by, rented to or controlled by the **named assured**;

(l) to **property damage** to premises alienated by the **named assured** arising out of such premises or any part thereof;

(m) to loss of use of tangible property which has not been physically injured or destroyed resulting from

(1) a delay in or lack of performance by or on behalf of the **named assured** of any contract or agreement, or

(2) the failure of the **named assured's products** or work performed by or on behalf of the **named assured** to meet the level of performance, quality, fitness or durability warranted or represented by the **named assured**;

but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the **named assured's products** or work performed by or on behalf of the **named assured** after such products or work have been put to use by any person or organization other than an **assured**;

(n) to **property damage** to the **named assured's products** arising out of such products or any part of such products;

(o) to **property damage** to work performed by or on behalf of the **named assured** arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

(p) to damages claimed for the withdrawal, inspection, repair, replacement, or loss of the use of the **named assured's products** or work completed by or for the **named assured**, or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

(q) to **bodily injury** or **property damage** due to war, whether or not declared, civil war, insurrection, rebellion or revolution or to any act or condition incident to any of the foregoing, with respect to

(1) liability assumed by the **assured** under any **incidental contract**, or

(2) expenses for first aid under the Supplementary Payments provision;

(r) to **bodily injury** and **property damage** arising out of demolition operations performed by or on behalf of the **assured**.

(s) to property damage included within:

(1) the explosion hazard in connection with operations identified in this certificate by a classification code number which includes the symbol "X".

(2) the collapse hazard in connection with operations identified in this certificate by a classification code number which includes the symbol "C".

(3) the underground property damage hazard in connection with operations identified in this certificate by a classification code number which includes the symbol "u".

## II. PERSON COVERED

Each of the following is an assured under this coverage to the extent set forth below:

(a) if the named assured is designated in the Declarations as an individual, the person so designated but only with respect to the conduct of a business of which he is the sole proprietor and the spouse of the named assured with respect to the conduct of such a business;

(b) if the named assured is designated in the Declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such;

(c) if the named assured is designated in the Declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such;

(d) any person (other than an employee of the named assured) or organization while acting as real estate manager for the named assured; and

(e) with respect to the operation, for the purpose of locomotion upon a public highway, of mobile equipment registered under any motor vehicle registration law;

(i) an employee of the named assured while operating any such equipment in the course of his employment, and

(ii) any other person while operating with the permission of the named assured any such equipment registered in the name of the named assured and any person or organization legally responsible for such operation, but only if there is no other valid and collectible insurance available, either on a primary or excess basis, to such person or organization;

provided that no person or organization shall be an assured under this paragraph (e) with respect to:

(1) bodily injury to any fellow employee of such person injured in the course of his employment, or

(2) property damage to property owned by, rented to, in charge of or occupied by the named assured or the employer of any person described in subparagraph (ii).

This coverage does not apply to bodily injury or property damage arising out of the conduct of any partnership or joint venture of which the assured is a partner or member and which is not designated in this certificate as a named assured.

## III. LIMITS OF LIABILITY

Regardless of the number of (1) assureds under this certificate, (2) persons or organizations who sustain bodily injury or property damage, or (3) claims made or suits brought on account of bodily injury or property damage, the Society's liability is limited as follows:

Bodily Injury and Property Damage Combined—Subject to the provisions below concerning "aggregate", limit of liability stated in the Declarations as applicable to "each occurrence" is the total limit of the Society's liability because of Bodily Injury and Property Damage Combined for all damages as the result of any one occurrence, provided that with respect to any occurrence for which notice of this certificate is given in lieu of security or when this certificate is certified as proof of financial responsibility under the provisions of the motor vehicle financial responsibility law of any state or province, such limit of liability shall be applied to provide the separate limits required by such law for bodily injury liability and property damage liability to the extent of the coverage required by such law, but the separate application of such limit shall not increase the total limit of the Society's liability.

The total liability of the Society for all damages because of all bodily injury and property damage to which this coverage applies and described in any of the numbered subparagraphs below shall not exceed the limit of liability stated in the schedule as "aggregate".

(1) all property damage arising out of premises or operations rated on a remuneration basis or contractor's equipment rated on a receipts basis, including property damage for which liability is assumed under any incidental contract relating to such premises or operations, but excluding property damage included in subparagraph (2) below;

(2) all property damage arising out of and occurring in the course of operations performed for the named assured by independent contractors and general supervision thereof by the named assured, including any such property damage for which liability is assumed under any incidental contract relating to such operations, but this subparagraph (2) does not include property damage arising out of maintenance or repairs at premises owned by or rented to the named assured or structural alterations at such premises which do not involve changing the size of or moving buildings or other structures;

(3) all bodily injury and property damage included within the completed operations hazard and all bodily injury and property damage included within the products hazard.

Such aggregate limit shall apply separately (i) to the property damage described in subparagraphs (1) and (2), (ii) to the sum of the damages of all bodily injury and all property damage described in subparagraph (3) and (iii) separately with respect to each project away from premises owned by or rented to the named assured.

Bodily Injury and Property Damage— For the purpose of determining the limit of the Society's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

## IV. ADDITIONAL DEFINITION

When used in reference to this coverage (including endorsements forming a part of the certificate):

"covered premises" means (1) the premises designated in the declarations, (2) premises alienated by the named assured (other than premises constructed for sale by the named assured), if possession has been relinquished to others, and (3) premises as to which the named assured acquires ownership or control and reports its intention to cover such premises under this certificate and no other within 30 days after such acquisition; and includes the ways immediately adjoining such premises on land.

## V. CERTIFICATE TERRITORY

This coverage applies only to bodily injury or property damage which occurs within the certificate territory.

### PREMISES MEDICAL PAYMENTS

I. The Society will pay to or for each person who sustains bodily injury caused by accident all reasonable medical expense incurred within one year from the date of the accident on account of such bodily injury, provided such bodily injury arises out of a condition in the covered premises of operations with respect to which the named assured is afforded coverage for bodily injury liability under this certificate.

### Exclusions

This coverage does not apply:

(a) to bodily injury

(1) arising out of the ownership, maintenance, operation, use, loading or unloading of

(i) any automobile or aircraft owned or operated by or rented to or loaned to any assured, or

(ii) any other automobile or aircraft operated by any person in the course of his employment by any assured;

but this exclusion does not apply to the parking of an automobile on the covered premises, if such automobile is not owned by or rented or loaned to any assured;

(2) arising out of (i) the ownership, maintenance, operation, use, loading or unloading of any mobile equipment while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for any such contest or activity or (ii) the operation or use of any snowmobile or trailer designed for use therewith;

CM-DULUTH-R000040

(3) arising out of the ownership, [ enance, operation, use, loading or unloading of

(i) any watercraft owned or operated by or rented or loaned to any **assured**, or

(ii) any other watercraft operated by any person in the course of his employment by any **assured**;

but this exclusion does not apply to watercraft while ashore on the **covered premises**; or

(4) arising out of and in the course of the transportation of **mobile equipment** by an **automobile** owned or operated by or rented or loaned to any **assured**;

(5) arising out of operations on or from premises (other than **covered premises**) owned by, rented to, or controlled by the **named assured**;

(b) **to bodily injury**

(1) included within the **complete operations hazard** or the **products hazard**;

(2) arising out of operations performed for the **named assured** by independent contractors other than (i) maintenance and repair of the **covered premises** or (ii) structural alterations of such premises which do not involve changing the size of or moving buildings or other structures;

(3) resulting from selling, serving or giving of any alcoholic beverage (i) in violation of any statute, ordinance or regulation, (ii) to a minor, (iii) to a person under the influence of alcohol or (iv) which caused or contributes to the intoxication of any person, if the **named assured** is a person or organization engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages or, if not so engaged, is an owner or lessor of premises used for such purposes but only part (i) of this exclusion (b) (3) applies when the **named assured** is such an owner or lessor;

(4) due to war, whether or not declared, civil war, insurrection, rebellion or revolution, or to any act or condition incident to any of the foregoing;

(c) **to bodily injury**

(1) to the **named assured**, any partner therein, any tenant or other person regularly residing on the **covered premiss** or any employee of any of the foregoing if the **bodily injury** arises out of and in the course of his employment therewith;

(2) to any other tenant if the **bodily injury** occurs on that part of the **covered premises** rented from the **named assured** or to any employee of such a tenant if the **bodily injury** occurs on the tenant's part of the **covered premises** and arises out of and in the course of his employment for the tenant;

(3) to any p[ while engaged in maintenance and repair of the **covered premises** or alteration, demolition or new construction at such premises;

(4) to any person if any benfits for such **bodily injury** are payable or required to be provided under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(5) to any person practicing, instructing or participating in any physical training, sport, athletic activity or contest;

(d) to any **medical expense** for services by the **named assured**, any employee thereof or any person or organization under contract to the **named assured** to provide such services.

## II. LIMITS OF LIABILITY

The limit of liability for Premises Medical Payments Coverage stated in the schedule as applicable to "each person" is the limit of the Society's liability for all **medical expense** for **bodily injury** to any one person as the result of any one accident; but subject to the above provision respecting "each person", the total liability of the Society under Premises Medical Payments Coverage for all **medical expense** for **bodily injury** to two or more persons as the result of any one accident shall not exceed the limit of liability stated in the schedule as applicable to "each accident".

When more than one medical payments coverage afforded by this certificate applies to the loss, the Society shall not be liable for more than the amount of the highest applicable limit of liability.

## III. ADDITIONAL DEFINITION

When used in reference to this coverage (including endorsements forming a part of the certificate):

"**covered premises**" mean all premises owned by or rented to the **named assured** with respect to which the **named assured** is afforded coverage for **bodily injury** liability under this certificate, and includes the ways immediately adjoining on land;

"**medical expense**" means expenses for necessary medical, surgical, x-ray and dental services, including prosthetic devices, and necessary ambulance, hospital, professional nursing and funeral services.

## IV. CERTIFICATE PERIOD; TERRITORY

This coverage applies only to accidents which occur during the certificate period within the United States of America, its territories or possessions, or Canada.

CM-DULUTH-R000041

# CATHOLIC MUTUAL RELIEF SOCIETY

## UMBRELLA EXCESS LIABILITY COVERAGE

In consideration of the payment of the charge, in reliance upon the statements in the Declarations made a part hereof and subject to all the terms of this Certificate, agrees with the Named Assured in the Declarations as follows:

## COVERAGE AGREEMENTS

### I. COVERAGE

The Society will indemnify the Assured for all sums which the Assured shall be legally obligated to pay as damages, all as more fully defined by the term "ultimate net loss" on account of:

1. Personal Injuries,
2. Property Damage,
3. Advertising Offense,

to which this Certificate applies, caused by an occurrence.

### II. DEFENSE, SETTLEMENT AND SUPPLEMENTARY PAYMENTS

With respect to any occurrence not covered by the underlying certificate(s) of coverage described in the Schedule A hereof or any other underlying coverage collectible by the Assured, but covered by terms and conditions of this Certificate except for the amount of retained limit specified in Item 4(c) of the Declarations, the Society will in addition to the amount of the ultimate net loss payable:

(a) defend any suit against the Assured seeking damages on account of personal injury, property damage or advertising offense even if such suit is groundless, false or fraudulent; and may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;

(b) pay cost of bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this Certificate, pay cost of appeal bonds required in any such detended suit, and the cost of bail bonds required of the Assured because of accident or traffic law violation arising out of the use of any vehicle to which this Certificate applies, but without any obligation to apply for or furnish any such bonds;

(c) pay all expenses incurred by the Society, all costs taxed against the Assured in any such suit defended by the Society and all interest on the entire amount of any judgment therein which accrues after entry of judgment and the Society has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the Society's liability thereon;

(d) pay reasonable expenses incurred by the Assured at the Society's request, including actual loss of wages or salary (but not loss of other income) not to exceed $50 per day because of his attendance at hearings or trials at such request.

In jurisdictions where the Society may be prevented by law or otherwise from carrying out this agreement, the Society shall pay any expense incurred with its written consent in accordance with this agreement.

The Assured shall promptly reimburse the Society for any amount of ultimate net loss paid on behalf of the Assured within the retained limit specified in Item 4(c) of the Declarations.

### III. LIMIT OF LIABILITY

Regardless of the number of (1) Assureds under this Certificate, (2) persons or organizations who sustain injury or damage, or (3) claims made or suits brought on account of personal injury, property damage, or advertising offense, the Society's liability is limited as follows:

With respect to personal injury, property damage or advertising offense, or any combination thereof, the Society's liability shall be only for the ultimate net loss in excess of the Assured's retained limit defined as the greater of:

(a) an amount equal to the limits of liability indicated beside the underlying coverage listed in Schedule A hereof, plus the applicable limits of any other underlying coverage collectible by the Assured; or

(b) the amount specified in Item 4(c) of the Declarations as the result of any one occurrence not covered by the said coverage;

and then for an amount not exceeding the amount specified in Item 4(a) of the Declarations as the result of any one occurrence. The Society's liability shall be further limited to the amount state in Item 4(b) of the Declarations on account of all occurrences during each certificate year arising out of either the products hazard or completed operations hazard or both combined.

In the event of reduction or exhaustion of the aggregate limits of liability under said underlying coverage by reason of losses paid thereunder, this Certificate shall, subject to the terms and conditions of the underlying coverage,

(1) in the event of reduction pay the excess of the reduced underlying limit;

(2) in the event of exhaustion continue in force as underlying coverage.

For the purpose of determining the limit of the Society's liability, all damages arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

### IV. CERTIFICATE PERIOD, TERRITORY

This certificate applies to personal injury, property damage or advertising offense which occurs anywhere during the certificate period.

### V. PERSONS OR ENTITIES COVERED

(a) The Named Assured;

(b) Each of the following is an Assured under this Certificate to the extent set forth below:

(1) If the Assured is designated in the Declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such, however, if the Assured is a partnership, this Certificate does not apply to an automobile owned by or registered in the name of a partner thereof. This Certificate does not apply to personal injury, property damage or advertising offense arising out of the conduct of any partnership or joint venture of which the Assured is a partner or member and which is not designated in this Certificate as an Assured;

(2) any person, organization, trustee or estate to whom or to which the Assured is obligated by virtue of a written contract to provide coverage such as is afforded by this Certificate, but only with respect to operations by or in behalf of the Assured or to facilities of or used by the Assured;

(3) subject to the terms and conditions of this Certificate, any additional Assured included in the underlying coverage listed in Schedule A but only to the extent that coverage is provided to such additional Assured thereunder;

(4) except with respect to the ownership, maintenance or use, including loading or unloading of automobiles (i) any executive officer, other employee, director or stockholder of the Assured while acting within the scope of his duties as such; (ii) any person or organization while acting as real estate manager for the Assured;

(5) any person while using, with the permission of the Assured, any automobile owned by, loaned to or hired for use by or on behalf of the Assured and any person or organization legally responsible for the use thereof, provided the actual operation or other actual use is within the scope of such permission, and any executive officer, director or stockholder of the Assured with respect to the use of an automobile not owned by the executive officer, director or stockholder or by a member of his household or by the Assured but only while such automobile is being used in the business of the Assured. The coverage with respect to any person or organization other than the Assured does not apply under this paragraph (5):

(i) to any person or organization, or to any agent or employee thereof, operating an automobile sales agency, repair shop, service station, storage garage or public parking plac, with respect to any occurence arising out of the operation thereof;

(ii) with respect to any automobile hired by or loaned to the owner or a lessee (of whom the Assured is a sub-lessee) thereof other than the Assured, or to any agent or employee of such owner or lessee.

CM-DULUTH-R000046

## EXCLUSIONS

This Certificate shall not apply:

(a) to any obligation for which the Assured or any company providing coverage may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law provided however, that this exclusion does not apply to liability of others as assumed by the Assured under contract or agreement;

(b) to property damage to (1) the Assured's products arising out of such products or any part of such products, or (2) work performed by or on behalf of the Assured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

(c) to personal injury or property damage resulting from the failure of the Assured's products or work completed by or for the Assured to perform the function or serve the purpose intended by the Assured, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any Assured; but this exclusion does not apply to bodily injury or property damage resulting from the active malfunctioning of such products or work;

(d) to damages claimed for the withdrawal, inspection, repair, replacement or loss of use of the Assured's products or work completed by or for the Assured or of any property of which such products or work from a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

(e) under Coverage 3, to claim made against the Assured for:

(1) failure of performance of contract, but this shall not relate to claims for unauthorized appropriation of ideas based upon alleged breach of an implied contract;

(2) infringement of registered trade mark, service mark or trade name by use thereof as the registered trade mark, service mark or trade name of goods or services sold, offered for sale or advertised, but this shall not relate to titles or slogans;

(3) incorrect description of any article or commodity;

(4) mistake in advertised price;

(f) to personal injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of:

(1) any aircraft owned or operated by or rented or loaned to the Assured;

(2) any other aircraft operated by any person in the course of his employment by the Assured unless coverage therefor is provided by a certificate listed in Schedule A and then not for broader coverage than is afforded by such coverage;

(g) to liability arising out of the ownership, maintenance, operation, use, loading or unloading of watercraft over 75 feet in length unless (1) coverage therefor is provided by certificate listed in Schedule A or (2) notice is given the Society within thirty days following date of acquisition of such new watercraft;

(h) to any employee with respect to injury to or the death of another employee of the same Employer injured in the course of such employment unless coverage therefor is provided by a certificate listed in Schedule A and then not for broader coverage than is afforded to such employee by that certificate;

(i) under Coverage 2, to injury to or destruction of (1) property owned by the Assured, or (2) aircraft or watercraft rented to, used by or in the care, custody or control of the Assured, or (3) property rented to, occupied or used by or in the care, custody or control of the Assured to the extent the Assured is under contract to provide coverage therefor.

## NUCLEAR ENERGY LIABILITY EXCLUSION

This Certificate does not apply:

(a) Under any Liability Coverage, to bodily injury or property damage:

(1) with respect to which an Assured under this Certificate is also an Assured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the Assured is, or had this certificate not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

(b) Under any Medical Payments Coverage, or under any Supplementary Payments provision relating to first aid, to expenses incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

(c) Under any Liability Coverage, to bodily injury or property damage resulting from the hazardous properties of nuclear material, if

(1) the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an Assured or (b) has been discharged or dispersed therefrom;

(2) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an Assured; or

(3) the bodily injury or property damage arises out of the furnishing by an Assured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to property damage to such nuclear facility and property thereat.

(d) As used in this exclusion:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or byproduct material;

"source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (1) or (2) thereof;

"nuclear facility" means

(1) any nuclear reactor,

(2) any equipment or device designed or used for (a) separating the isotopes of uranium or plutonium, (b) processing or utilizing spent fuel, or (c) handling, processing or packaging waste,

(3) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Assured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(4) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site of which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"property damage" includes all forms of radioactive contamination of property.

CM-DULUTH-R000047

**DEFINITIONS**

## 1. ADVERTISING OFFENSE

The term ''Advertising Offense'' wherever used herein shall mean:

(1) Libel, slander or defamation;

(2) Any infringement of copyright or of title or of slogan;

(3) Piracy or unfair competition or idea misappropriation under an implied contract;

(4) Any invasion of right of privacy;

committed or alleged to have been committed in any advertisement, publicity article, broadcast or telecast and arising out of the Assured's Advertising activities.

## 2. AIRCRAFT

The term ''Aircraft'' wherever used herein, shall mean any heavier than air or lighter than air aircraft designed to transport persons or property.

## 3. COMPLETED OPERATIONS HAZARD

The term ''Completed Operations Hazard'' includes personal injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the Assured.

''Operations'' include materials, parts or equipment furnished in connection therewith.

Operations shall be deemed completed at the earliest of the following times:

(a) when all operations to be performed by or on behalf of the Assured under the contract have been completed,

(b) when all operations to be performed by or on behalf of the Assured at the site of the operations have been completed, or

(c) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete shall be deemed completed.

The completed operations hazard does not include personal injury or property damage arising out of:

(1) operations in connection with the transportation of property, unless the personal injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,

(2) the existence of tools, uninstalled equipment or abandoned or unused materials.

## 4. DAMAGES

The term ''Damages'' includes damages for death and for care and loss of services resulting from personal injury and damages for loss of use of property resulting from property damage.

## 5. ASSURED

The term ''Assured'' means the organization named in the Declarations of this Certificate and any subsidiary, owned or controlled companies as now or herafter constituted and of which prompt notice has been given to the Society. The term ''Assured'' also means any person or organization qualifying as a named entity in the provisions of the applicable coverage. The coverage afforded applies separately to each Assured against whom claim is made or suit is brought, except with respect to the limits of the Society's liability.

## 6. ASSURED'S PRODUCTS

The term ''Assured's Products'' means goods or products manufactured, sold, handled or distributed by the Assured or by others trading under his name, including any container thereof (other than a vehicle), but ''Assured's Products'' shall not include a vending machine or any property other than such a container, rented to or located for use of others but not sold.

## 7. OCCURRENCE

The term ''Occurrence'' means an accident, including injurious exposure to conditons, which results, during the certificate period, in personal injury, property damage or advertising offense neither expected nor intended from the standpoint of the Assured.

## 8. PERSONAL INJURIES

The term ''Personal Injuries'' wherever used herein means bodily injury, mental injury, mental anguish, shock, sickness, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination, (unless coverage therefor is prohibited by law), humiliation; also libel, slander or defamation of character or invasion or rights of privacy, except that which arises out of any Advertising activities.

## 9. PRODUCTS HAZARD

The term ''Products Hazard'' includes personal injury and property damage arising out of the Assured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs away from premises owned by or rented to the Assured and after physical possession of such products has been relinquished to others.

## 10. PROPERTY DAMAGE

The term ''Property Damage'' means injury to or destruction of tangible property.

## 11. ULTIMATE NET LOSS

The term ''Ultimate Net Loss'' means the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the Assured is liable either by adjudication or compromise with the written consent of the Society, after making proper deduction for all recoveries and salvages collectible, but excludes all loss expenses and legal expenses (including attorneys' fees, court costs and interest on any judgment or award) and all salaries of employees and office expenses of the Assured, the Society or any underlying insurer so incurred.

## A. CHARGE

Unless otherwise provided, the charge for this Certificate is a flat charge and is not subject to adjustment except as provided herein and in Condition K.

In the event of additional Assureds being added to the coverage under the Underlying Coverages during currency hereof prompt notice shall be given to the Society hereon and if an additional charge has been charged for such addition of the Underlying Coverages, the Society shall be entitled to make an appropriate additional charge hereon.

## B. INSPECTION AND AUDIT

The Society shall be permitted but not obligated to inspect the Assured's property and operations at any time. Neither the Society's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the Assured or others, to determine or warrant that such property or operations are safe. The Society may examine and audit the Assured's books and records at any time during the certificate period and extensions thereof and within three years after the final termination of this Certificate, as far as they relate to the subject matter of this Coverage.

## C. ASSURED'S DUTIES IN THE EVENT OF OCCURRENCE, CLAIM OR SUIT:

(1) In the event of an occurrence, which appears likely to involve this Certificate, written notice containing particulars sufficient to identify the Assured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the Assured to the Society or any of its authorized agents as soon as practicable. The Assured shall promptly take at his expense all reasonable steps to prevent other personal injury or property damage or advertising offense from arising out of the same or similar conditions, but such expense shall not be recoverable under this Certificate.

(2) If claim is made or suit is brought against the Assured because of an occurrence which appears likely to involve this Certificate, the Assured shall immediately forward to the Society every demand, notice, summons or other process received by him or his representative.

(3) The Assured shall cooperate with the Society and, upon the Society's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Assured because of personal injury or property damage or advertising offense with respect to which coverage is afforded under this Certificate; and the Assured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The Assured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense; however, in the event that the amount of ultimate net loss becomes certain either through trial court judgment or agreement among the Assured, the claimant and the Society, then, the Assured may pay the amount of ultimate net loss to the claimant to effect settlement, and, upon submission of due proof thereof, the Society shall indemnify the Assured for that part of such payment which is in excess of the retained limit, or, the Society will, upon request of the Assured, make such payment to the claimant on behalf of the Assured.

## D. APPEALS

In the event the Assured or any of the companies providing underlying coverage for the Assured elect not to appeal a judgment in excess of the retained limit, the Society may elect to make such appeal at their cost and expense, and shall be liable for the taxable costs and disbursements and interest incidental thereto, but in no event shall the liability of the Society for ultimate net loss exceed the amount set forth in Item 4 of the Declarations for any one occurrence and in addition the cost and expense of such appeal.

## E. ACTION AGAINST THE SOCIETY

No action shall lie against the Society with respect to any occurrence unless, as a condition precedent thereto, the Assured shall have fully complied with all the terms of this Certificate, nor until the amount of the Assured's obligation to pay an amount of ultimate net loss in excess of the retained limit shall have been finally determined either by judgment against the Assured after actual trial or by written agreement of the Assured, the claimant and the Society. The Assured shall make definite claim for any loss for which the Society may be liable within a reasonable time after such final determination. If any subsequent payments are made by the Assured on account of the same occurrence, the Assured shall make additional claims from time to time and these claims shall be payable within thirty (30) days after proof in conformity with this Certificate. Any person or organization or the legal representative therof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Certificate to the extent of the coverage afforded by this Certificate. Nothing contained in this Certificate shall give any person or organization any right to join the Society as a co-defendant in any action against the Assured to determine the Assured's liability.

Bankruptcy or insolvency of the Assured shall not relieve the Society of any of its obligations hereunder.

## F. OTHER INSURANCE

If other valid and collectible coverage with any other company is available to the Assured covering a loss also covered by this Certificate, other than coverage that is in excess of the coverage afforded by this Certificate, the coverage afforded by this Certificate shall be in excess of and shall not contribute with such other insurance. Nothing herein shall be construed to make this Certificate subject to the terms, conditons, and limitations of other insurance.

## G. SUBROGATION

The Society shall be subrogated to the extent of any payment hereunder to all the Assured's rights of recovery therefor; and the Assured shall do nothing after loss to prejudice such rights and shall do everything necessary to secure such rights. Any amount so recovered shall be apportioned as follows: Any interest (incluing the Assured's) having paid an amount in excess of the retained limit plus the limit of liability hereunder shall be reimbursed first to the extent of actual payment. The Society shall be reimbursed next to the extent of its actual payment hereunder. If any balance then remains unpaid, it shall be applied to reimburse the Assured or any underlying insurer, as their interest may appear. The expenses of all such recovery proceedings shall be apportioned in the ratio of respective recoveries. If there is no recovery in proceedings conducted solely by the Society, it shall bear the expenses thereof.

## H. ASSIGNMENT

Assignment of interest under this Certificate shall not bind the Society until its consent is endorsed hereon.

## I. THREE YEAR CERTIFICATE

If this Certificate is issued for a period of three years, the limits of the Society's liability shall apply separately to each consecutive annual period thereof.

## J. CANCELLATION

This Certificate may be cancelled by the Assured by surrender thereof to the Society or any of its authorized agents or by mailing to the Society written notice stating when thereafter the cancellation shall be effective. This Certificate may be cancelled by the Society by mailing to the Assured at the address shown in this Certificate written notice stating when, not less than thirty days thereafter, such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the certificate period. Delivery of such written notice either by the Assured or by the Society shall be equivalent to mailing. If the Assured cancels, the earned charge shall be computed in accordance with the customary short rate table and procedure. If the Society cancels, the earned charge shall be computed pro rata. Adjustment may be made either at the time cancellation is effect or as soon as practicable after cancellation becomes effective, but payment or tender of unearned charge is not acondition of cancellation.

## K. SPECIAL STATUTES

Any and all provisions of this Certificate which are in conflict with the statutes of the State wherein this Certificate is issued are understood, declared and acknowledged by this Society to be amended to conform to such statutes.

CM-DULUTH-R000049

**L. MAINTENANCE OF UNDERLYING COVERAGES**

It is a condition of this Certificate that the coverage documents referred to in the attached "Schedule A", including renewal or replacements thereof not more restrictive shall be maintained, without alteration of terms or conditions, in full effect during the currency of this Certificate except for any reduction or exhaustion of the aggregate limit contained therein solely by payment of claims. Failure of the Assured to comply with the foregoing shall not invalidate this Certificate but in the event of such failure the Society shall be liable hereunder only to the extent that it would have been liable had the Assured complied therewith

In the event there is no recovery available to the Assured as a result of insolvency of the underlying coverage or by reason of the Assured having breached the contract of underlying coverage, the coverage hereunder shall apply in excess of the following underlying coverage schedules and applicable limits of Liability:

| Type | Carrier | Term | Limits BI PD |
|---|---|---|---|
| | | REVISED | |
| (a) Comprehensive General Liability | CMRS | 4-1-82 to 4-1-85 | $300,000 Single Limit |
| (b) Automobile Liability | Various | Various | $100/300,000 B.I. 50,000 P.D. |
| (c) Employers Liability | Royal Insurance | 4-1-82 to 4-1-83 | $100,000 Nil |
| (d) Self Insured Limits | --- | --- | $10,000    $10,000 |

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

---

In re:

    Bankruptcy Case No. 15-50792

Diocese of Duluth,

    Chapter 11

        Debtor-in-Possession.

---

Diocese of Duluth,

        Plaintiff,

    Adversary Proceeding No. 16-05012

v.

LIBERTY MUTUAL GROUP, a Massachusetts
corporation; CATHOLIC MUTUAL RELIEF
SOCIETY OF AMERICA, a Nebraska
corporation; FIREMAN'S FUND
INSURANCE COMPANY, a California
corporation; CHURCH MUTUAL
INSURANCE COMPANY, a Wisconsin
corporation and THE CONTINENTAL
INSURANCE COMPANY, an Illinois
corporation,

        Defendants.

---

### CERTIFICATE OF SERVICE

---

    I, Christopher J. Knapp, hereby certify that on the 3rd day of February 2017, I caused a
true and correct copy of the foregoing Response to Plaintiff's Motion For Partial Summary
Judgment and Declaration of David M. Spector In Support of Catholic Mutual's Respones to
Plaintiff's Motion for Partial Summary Judgment to be filed electronically with the Clerk of the
Bankruptcy Court through ECF, and that ECF will send an e-notice of the electronic filing to the
following counsel of record.

Dated: February 3, 2017

                By: /e/ Christopher J. Knapp

**Fireman's Fund Insurance Company**
Charles E. Jones
MOSS & BARNETT
150 South Fifth Street, Suite 1200
Minneapolis, MN 55402
Charles.jones@lawmoss.com

**The Diocese of Duluth x**
James R. Murray
BLANK ROME LLP
1825 Eye Street NW
Washington, DC 20006
Jmurray@blankrome.com

**The Diocese of Duluth x**
Jared Zola
BLANK ROME LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
jzola@blankrome.com

**The Diocese of Duluth**
J. Ford Elsaesser
Bruce A. Anderson
ELSAESSER JARZABEK ANDERSON
ELLIOT & MACDONALD, CHTD
123 South Third Avenue, Suite 24
Sandpoint, ID 83864
Ford@ejame.com
baafiling@ejame.com

**The Diocese of Duluth**
Phillip L. Kunkel
Abigail M. McGibbon
GRAY PLANT MOOTY MOOTY &
BENNET, P.A.
1010 West Germain Street, Suite 500
St. Cloud, MN 56301
Phillip.kunkel@gpmlaw.com
Abigail.mcgibbon@gpmlaw.com

**The Continental Insurance Company**
Laura McNally
LOEB & LOEB LLP
2321 North Clark Street, Suite 2300
Chicago, IL 60654
lmcnally@loeb.com

**Church Mutual Insurance Company**
Christian A. Preus
BASSFORD REMELE, P.A.
33 South Sixth Street, Suite 3800
Minneapolis, MN 55402
cpreus@bassford.com

**The Continental Insurance Company**
Jeanne H. Unger
Jeffrey D. Klobucar
BASSFORD REMELE, P.A.
33 South Sixth Street, Suite 3800
Minneapolis, MN 55402
junger@bassford.com
jklobucar@bassford.com

**Liberty Mutual Insurance Company**
Nancy D. Adams
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, Massachusetts 02111
nadams@mintz.com

**Liberty Mutual Insurance Company**
Kristi K. Brownson
Brownson and Brownson & Linnihan, PLLP
225 South Sixth Street, Suite 4800
Minneapolis, MN 55402
kbrownson@brownsonlinnihan.com